[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 95-6429

_____

D. C. Docket No. 93-P-1508-S

UNITED STATES OF AMERICA,
Qui Tam for Frank E. Body,

Plaintiff-Appellant,

versus

BLUE CROSS AND BLUE SHIELD
OF ALABAMA, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(June 26, 1998)**

Before TJOFLAT and BIRCH, Circuit Judges, SMITH*, Senior Circuit Judge.

_____
*Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

Frank E. Body appeals the district court's dismissal of his claim against Blue Cross and Blue Shield of Alabama ("BCBSA") for lack of subject matter jurisdiction.  Body, a former employee of BCBSA, brought suit as a qui tam relator under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33 (1994), alleging that BCBSA, in its role as a fiscal intermediary for Medicare Part A claims in Alabama, knowingly presented or caused to be presented false or fraudulent claims to the United States government in violation of 31 U.S.C. § 3729(a).  The district court held that 42 U.S.C. § 405(h) (1994), a provision of the Social Security Act[1] made applicable to the Medicare Act[2] by 42 U.S.C. § 1395ii (1994), operated as a bar to its subject matter jurisdiction over the case, and therefore dismissed Body's suit.  Body appealed the district court's decision to this court.  We disagree with the district court's interpretation of subsection 405(h), but affirm the district court's dismissal because we find that under 42 U.S.C. § 1395h(i)(3) (1994), BCBSA is immune from liability to the United States for payments its officers certify and disburse to Medicare beneficiaries.

In part I, we describe the factual and procedural background of Body's case.  In part II, we explain why we disagree with the

_____

[1]    42 U.S.C. § 301 et seq. (1994).

[2]    42 U.S.C. § 1395 et seq. (1994).

1

district court's interpretation of subsection 405(h), analyzing both the context within which the subsection is made applicable to the Medicare Act, and the Supreme Court cases that have construed it. In part III, we discuss the meaning and applicability of subsection 1395h(i)(3), and explain why it shields BCBSA from liability to the United States in the current action.

I.

Frank E. Body was an employee of appellee Blue Cross and Blue Shield of Alabama from 1973 to 1989. In addition to its traditional role as a provider of medical insurance, BCBSA serves as a fiscal intermediary for Medicare Part A in Alabama.[3] In its role as a fiscal intermediary, BCBSA processes and audits cost reports from hospitals in Alabama, adjudicates disputed claims for benefits from these health service providers, and issues

---

[3]  The Medicare program is administered by the Health Care Finance Administration (the "HCFA"), part of the Department of Health and Human Services ("HHS"). The program is authorized by Title VIII of the Social Security Act, and is divided into two parts. Part A of the Medicare program deals primarily with the reimbursement of hospitals for costs that they incur treating patients covered by Medicare, while Part B generally deals with the reimbursement of providers for physicians' services. Under 42 U.S.C. § 1395h(a), the Secretary of Health and Human Services (the "Secretary") can contract with public or private agencies or organizations to serve as fiscal intermediaries in administering Medicare Part A. Blue Cross and Blue Shield Association ("BCA") entered into such a contract with the Secretary. BCA then subcontracted with BCBSA to serve as a fiscal intermediary for Medicare in Alabama.

2

reimbursement payments to these hospitals for costs appropriately incurred in the treatment of Medicare patients. BCBSA applies provisions from a number of different sources to its administration of Medicare Part A, including: 1) portions of Title VIII of the Social Security Act governing Medicare; 2) regulations contained in Title 42, Part 405 of the Code of Federal Regulations; 3) provisions contained in the Provider Reimbursement Manual (the "Manual") issued by the HCFA; 4) periodic "policy statements" from the HCFA; and 5) additional guidance from BCA to its subcontractors, issued in the form of Administrative Bulletins.

Body was employed as a senior auditor by BCBSA in 1984, and was assigned to audit the 1983 cost reports of, among others, Baptist Medical Centers ("Baptist") and Carraway Methodist Medical Center ("Carraway"). In the course of auditing the cost reports of Baptist and Carraway, Body proposed a number of adjustments to the hospitals' reports based on his application of Medicare regulations, provisions of the Manual, and guidelines from BCA. In general, Body's adjustments related to interest expenses claimed on refunded capital debt (i.e., interest on bonds issued, at least in part, to pay off an older bond issue) and to interest earned on funded depreciation accounts (i.e., accounts containing funds set aside for future capital expenses). BCBSA disagreed with a number of Body's recommendations, and,

3

despite his protest, reversed his proposed adjustments.

Body contacted the Federal Bureau of Investigation in January 1989 to report BCBSA's reimbursements to Alabama hospitals of interest costs that he felt were not authorized under Medicare regulations. The FBI referred Body to the Office of the Inspector General ("OIG") of HHS, which initiated an investigation of the allegations. The OIG investigated fourteen adjustments proposed by Body and reversed by BCBSA. In its report, dated September 1994, the OIG concluded that four of the fourteen adjustments were "immaterial," six were properly handled by BCBSA, two of the adjustments had been reinstated by BCBSA upon HCFA instruction, and the final two adjustments were determined to be correctly handled by BCBSA after the HCFA issued a policy clarification.

In August 1993, prior to the issuance of the OIG's final report, Body instituted this lawsuit for the United States as a qui tam relator[4] under the False Claims Act. Body alleges that BCBSA has been reimbursing Alabama hospitals, in particular Baptist and Carraway, for interest costs that are not chargeable to Medicare. His complaint essentially reiterated the

---

[4]    The qui tam provision of the FCA permits, in certain circumstances, suits by private parties ("relators") on behalf of the United States against anyone submitting a false claim to the Government. See 31 U.S.C. §3730(b); Hughes Aircraft Co. v. U.S. ex rel. Schumer, --- U.S. ---, ---, 117 S.Ct. 1871, 1874, 138 L.Ed.2d 135 (1997).

4

information that he provided to the OIG regarding BCBSA's handling of the 1983 cost reports of Baptist and Carraway, and claimed that BCBSA continues to allow Medicare to be charged unallowable interest expenses.[5] Body asserted that the district court had jurisdiction over his action pursuant to 31 U.S.C. § 3732(a).[6]

BCBSA moved the district court, <u>inter alia</u>, for summary judgment on the ground that the court lacked subject matter jurisdiction over Body's complaint. BCBSA argued that subsection 3732(a) was simply a venue provision, and as a result, Body's claim depended upon general federal-question subject matter jurisdiction under 28 U.S.C. § 1331 (1994). BCBSA argued further that 42 U.S.C. § 405(h) acted as a bar to federal-question jurisdiction for Body's claims. The third sentence of subsection

---

[5] Body's complaint asserted that BCBSA had improperly reimbursed other Alabama hospitals, in addition to Baptist and Carraway, for costs not properly certifiable to Medicare. These additional allegations are not discussed here, because they fail under the same legal conclusion that precludes Body's claims against Baptist and Carraway.

[6] Subsection 3732(a), entitled "False claims jurisdiction," states:

> Actions Under Section 3730. – Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred. A summons as required by the Federal Rules of Civil Procedure shall be issued by the appropriate district court and served at any place within or outside the United States.

5

405(h) states:

> No action against the United States, the [Secretary],
> or any officer or employee thereof shall be brought
> under section 1331 or 1346 of Title 28 to recover on
> any claim arising under this subchapter.

42 U.S.C. § 405(h) (as made applicable to Medicare and modified by 42 U.S.C. § 1395ii). In its April 28, 1995 opinion, the district court agreed that subsection 405(h) deprived the court of jurisdiction under section 1331 and found no other jurisdictional provision, including subsection 3732(a), that could save Body's claims. The district court, therefore, granted BCBSA summary judgment and ordered Body's suit dismissed.[7] Body appeals the district court's dismissal.

This court has jurisdiction to hear this appeal of the district court's final decision pursuant to 28 U.S.C. § 1291 (1994). We review de novo the district court's dismissal of Body's action for lack of subject matter jurisdiction. See

---

[7] BCBSA raised the issue of subject matter jurisdiction in a motion for summary judgment. Subject matter jurisdiction is appropriately dealt with by means of a Federal Rule of Civil Procedure Rule 12(b)(1) motion to dismiss, as noted by the district court, and we will treat the district court's summary judgment ruling as a dismissal under Rule 12(b)(1). See Tuley v. Heyd, 482 F.2d 590, 593 (5th Cir. 1973) ("It is a familiar principle that the label a district court puts on its disposition of a case is not binding on a court of appeals.") (In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.). This court's jurisdiction and our analysis of the legal question raised on appeal are not affected by our treatment of the district court's action.

6

<u>Plumbers & Pipefitters Local Union 72 v. John Payne Co.</u>, 850 F.2d 1535, 1537 (11th Cir. 1988).

II.

Body raises three issues in this appeal.  First, he claims that subsection 3732(a) of the False Claims Act contains an independent grant of subject matter jurisdiction, and that therefore his claim does not rely on either of the jurisdictional provisions negated by subsection 405(h).  Second, Body claims that an action brought by a <u>qui</u> <u>tam</u> relator under the False Claims Act qualifies as a "proceeding[] commenced by the United States" within the meaning of 28 U.S.C. § 1345 (1994), again avoiding the jurisdictional bar of subsection 405(h).  Finally, Body argues that the district court erred in finding that subsection 405(h) was applicable to his action against BCBSA at all.  Because we find that the district court erred in holding that subsection 405(h) applied to Body's claims, we do not address the first two issues.

The third sentence of subsection 405(h) clearly revokes federal-question jurisdiction in the district courts under 28 U.S.C. § 1331 over all cases "arising under" the Medicare Act. The threshold question for this court, then, is whether Body's claim "arises under" the Medicare Act and is therefore subject to subsection 405(h).  <u>See</u> <u>Heckler v. Ringer</u>, 466 U.S. 602, 615, 104

7

S.Ct. 2013, 2021, 80 L.Ed.2d 622 (1984) ("[T]o be true to the language of the statute, the inquiry in determining whether § 405(h) bars federal-question jurisdiction must be whether the claim 'arises under' the Act . . . .").

Subsection 405(h) has been interpreted in many cases and by many courts -- in the context of its application both to actions arising under Social Security, for which it was originally drafted, and to actions arising under Medicare. In fact, the Supreme Court has discussed the scope of the subsection's jurisdictional preclusion in several significant opinions. All of these cases, however, involved suits brought <u>by beneficiaries</u>[8] against the United States or against a fiscal intermediary[9] to recover benefits <u>not previously paid</u>. As best as we can tell, the application of subsection 405(h) to a False Claims Act

---

[8]    We use the term "beneficiaries" in this opinion to denote the broad range of individuals and organizations that either receive health services covered by Medicare or receive payments from Medicare for providing health services to covered persons; these include: physicians, physicians' associations, hospitals, nursing homes, and other health care providers. In addition, when discussing the subsection's application to actions brought under the Social Security Act, we use the term generically to refer to individuals receiving Social Security benefits from the government.

[9]    We use this term here to include organizations that are the equivalent of fiscal intermediaries; i.e., the organization or agency responsible for determining eligibility for and amounts of benefits under either Medicare Part A or Part B, and under the Social Security Act. The organizations that administer Part B of the Medicare Act, for instance, are referred to as "carriers." <u>See</u> 42 U.S.C. § 1395u(f) (1994).

action, brought <u>by or for the United States</u> against a fiscal intermediary, to recover money <u>improperly paid to</u> Medicare beneficiaries is a matter of first impression in the federal courts. The relevance of this distinction to determining whether a particular action "arises under" the Medicare Act becomes apparent when one analyzes the role the subsection plays in the broader context of administrative and judicial challenges to Medicare determinations, as well as the Supreme Court's decisions interpreting the scope and application of subsection 405(h). In part II.A, therefore, we describe the larger system for administrative and judicial appeals of Medicare claims. In part II.B, we discuss the Supreme Court's decisions defining the applicability of subsection 405(h) to actions "arising under" both the Medicare Act and the Social Security Act. Finally, in part II.C, we conclude that Body's FCA claims do not "arise under" the Medicare Act for purposes of subsection 405(h).

A.

On its face, the third sentence of subsection 405(h) plainly reads as a broad exclusion of federal-question jurisdiction over matters "arising under" the Medicare Act. That sentence, however, neither exists nor operates in isolation. To understand the actual scope of the subsection's exclusive effect, therefore, we must view the third sentence of subsection 405(h) both within

the context of the entire section 405 -- most of which is made applicable to Medicare by sections 1395ff and 1395ii, see 42 U.S.C. § 1395ff(b)(1) (making subsections 405(b) and 405(g) applicable to challenges to Medicare coverage and amounts determinations); § 1395ii (making subsections 405(a), (d), (e), (h), (i), (j), (k), and (l) applicable to the Medicare Act) -- and within the larger context of the subsection's application to appeals under the Medicare Act in general.

Section 1395ff, entitled "Determinations of Secretary," governs the ability of beneficiaries dissatisfied with eligibility determinations or amount of benefits determinations to obtain a hearing and judicial review.  The section adopts by reference the Social Security Act's procedures for hearings and appeals as defined in subsections 405(b) and 405(g), respectively.  See 42 U.S.C. § 1395ff(b)(1).  Under subsection 405(g), a person dissatisfied with a decision of the Secretary of Health and Human Services after a hearing[10] may appeal the decision to a United States district court.  The subsection contains a specific grant of jurisdiction to the district courts, stating that "[s]uch action shall be brought in the district

_____

[10]    The decisions of the Secretary will actually be made in the first instance by fiscal intermediaries, followed by appeals to either an administrative law judge or a Departmental Appeals Board, or both.  See 42 C.F.R. §§ 405.701-405.730 (1997) (governing reconsideration and appeals of eligibility and amount of benefits decisions under Medicare Part A).

court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia." 42 U.S.C. § 405(g).

Subsection 405(h), which immediately follows subsection 405(g), channels all challenges to eligibility and amount determinations through the administrative and appeals process provided in subsections 405(b) and 405(g). The full subsection 405(h) states:

> The findings and decision of the [Secretary] after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the [Secretary] shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the [Secretary], or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter.

42 U.S.C. § 405(h) (as made applicable to Medicare and modified by section 1395ii). The first sentence of subsection 405(h) makes the decisions of the Secretary of Health and Human Services binding on all parties to the hearing. By its second sentence, the subsection prevents "any person, tribunal, or governmental agency" from reviewing the Secretary's decision, "except as herein provided" -- as "provided" by subsection 405(g) that is. Finally, the third sentence removes federal-question jurisdiction over any claim "arising under" the Medicare Act.

Taken alone, the third sentence of the subsection appears to be a plenary revocation of federal-question jurisdiction for Medicare-related cases. Taken in context, however, it is quite clear that the provision is intended to prevent circumvention of the administrative process provided for the adjudication of disputes between Medicare beneficiaries and the government (or agents of the government such as fiscal intermediaries). The provision takes away general federal-question jurisdiction over claims by Medicare beneficiaries, forcing them to pursue their claims in a hearing under subsection 405(b) and then, if necessary, in an appeal under the specific grant of jurisdiction contained in subsection 405(g). Thus, the third sentence is the final piece in an administrative scheme designed to give the administrative process the first opportunity to resolve disputes over eligibility or the amount of benefits awarded under the Act.

Nothing in subsection 405(h), however, or in the rest of section 405, suggests that the third sentence of subsection 405(h) eliminates federal-question jurisdiction over all actions implicating the Medicare Act, regardless of the availability -- or unavailability -- of administrative and judicial review within the Medicare administrative scheme.[11] Subsection 405(h) prevents

_____

[11]    Although the Supreme Court has never addressed the application of subsection 405(h) to a claim that could not be brought administratively under section 405, and subsequently appealed to a district court under subsection 405(g), the Court has implied that subsection 405(g) -- with its concomitant

12

beneficiaries and potential beneficiaries from evading administrative review by creatively styling their benefits and eligibility claims as constitutional or statutory challenges to Medicare statutes and regulations.[12]  It does not create two classes of claims "arising under" Medicare:  those that may be brought administratively and then appealed under the grant of jurisdiction in subsection 405(g), and those that are not subject to administrative review and are therefore not reviewable at

---

requirement of administrative exhaustion -- provides federal court jurisdiction over all claims for which subsection 405(h) removes federal-question jurisdiction under section 1331.  See Heckler, 466 U.S. at 614-15, 104 S.Ct. at 2021 ("The third sentence of 42 U.S.C. § 405(h) . . . provides that § 405(g), to the exclusion of 28 U.S.C. § 1331, is the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act." (emphasis added)) (citing Weinberger v. Salfi, 422 U.S. 749, 760-61, 95 S.Ct. 2457, 2464-65, 45 L.Ed.2d 522 (1975)).  This suggests that if administrative and judicial review is unavailable under section 405, then federal-question jurisdiction under section 1331 is not precluded by operation of subsection 405(h); the claim does not "arise under" Medicare.

[12]    For instance, the third sentence of the subsection prevents potential beneficiaries from bringing actions for declaratory and injunctive relief -- prior to filing for reimbursement for a health service, or even prior to receiving a health service at all -- that would direct the Secretary to provide reimbursement for that particular health service.  See Ringer, 466 U.S. at 620-22, 104 S.Ct. at 2024-25 (explaining that respondent Ringer's action for declaratory and injunctive relief, prior to the operation for which he ultimately wanted to be reimbursed, was still barred by subsection 405(h) because Ringer wants future payments for the operation that may only be pursued "in the manner which Congress has provided").  Instead, the beneficiary must obtain the health service and file an actual claim for reimbursement.  The beneficiary may then challenge the offending regulation in her action challenging the denial of reimbursement, obtaining judicial review only after administrative exhaustion.  See id. at 621-22, 104 S.Ct. at 2025.

13

<u>all</u>.[13]  Actions such as Body's, which do not seek payment from the government and could not be brought under section 405, are therefore not barred by subsection 405(h).

As we illustrate in part II.B, the Supreme Court's cases involving subsection 405(h) further confirm our interpretation of its purpose.

B.

The Supreme Court has analyzed the breadth and effect of subsection 405(h) in its application to both the Social Security Act and to Parts A and B of the Medicare Act.  Generally, the Court has given the provision a very broad reading, in an attempt to reflect the intent of the drafters.  See <u>Heckler</u>, 466 U.S. at 615, 104 S.Ct. at 2022 (noting that the Court "construed the 'claim arising under' language quite broadly" in <u>Salfi</u>, 422 U.S. at 760-61, 95 S.Ct. at 2464-65).  Although none of the Supreme Court cases that have analyzed the scope and effect of section 405(h) have involved suits by the government against any of its

---

[13]    There is very little legislative history available on subsection 405(h).  Nowhere, however, is there any mention of congressional intent to preclude federal-question jurisdiction over claims other than those brought by beneficiaries challenging the denial of benefits or eligibility for benefits.  See S. Rep. No. 89-404 (1965), <u>reprinted in</u> 1965 U.S.C.C.A.N. 1943, 1995 (describing appeals under the Medicare Act and noting, in apparent reference to subsection 405(h), that "the remedies provided by these review procedures shall be exclusive"); <u>see also</u> discussion of <u>Bowen v. Michigan Academy</u>, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), <u>infra</u> part II.B.

14

fiscal intermediaries, a close look at the rationale behind the Court's decisions construing the subsection is nonetheless instructive. Our examination reveals that the Supreme Court's justification for broadly construing the "claims arising under" language of subsection 405(h) is to prevent beneficiaries from circumventing the administrative process by creatively styling their benefits claims as collateral constitutional or statutory challenges not "arising under" Medicare.

The first major Supreme Court case to analyze the operation of subsection 405(h) was Weinberger v. Salfi, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). In Salfi, a deceased wage earner's widow and stepchild challenged the constitutionality of provisions of the Social Security Act requiring them to have had a nine-month-long relationship with the deceased in order to receive survivors' benefits. See id. at 752-55, 95 S.Ct. at 2460-62.[14] The three-judge district court held that the duration-of-relationship requirement was unconstitutional. Id. at 755, 95 S.Ct. at 2462. The district court found that it had jurisdiction over the case under 28 U.S.C. § 1331, concluding that subsection 405(h) was nothing more than a codification of the doctrine of administrative exhaustion. Id. at 756-57, 95

---

[14] Recall that subsection 405(h) is a provision of the Social Security Act made applicable to Medicare by section 1395ii. See supra part II.A.

15

S.Ct. at 2462-63.[15]

On appeal, the Supreme Court found that the three-judge district court had taken an "entirely too narrow" view of the scope of subsection 405(h). The Court stated:

> That the third sentence of § 405(h) is more than a codified requirement of administrative exhaustion is plain from its own language, which is sweeping and direct and which states that no action shall be brought under § 1331, not merely that only those actions shall be brought in which administrative remedies have been exhausted.

Id. at 757, 95 S.Ct. at 2463. The Court found more substantial the claim that subsection 405(h) did not bar jurisdiction over the widow and stepchild's claim because their claim "arose under" the Constitution rather than under the Social Security Act. Id. at 760, 95 S.Ct. at 2464. But the Court found that the action, although it indeed arose under the Constitution, also arose under the Social Security Act because, "not only is it Social Security benefits which appellees seek to recover, but it is the Social Security Act which provides both the standing and the substantive basis for the presentation of their constitutional contentions." Id. at 760-61, 95 S.Ct. at 2464 (emphasis added). Thus, the Court held that subsection 405(h) barred resort to federal-question jurisdiction under section 1331. Id. at 761, 95 S.Ct.

---

[15] The three-judge district court held further that exhaustion in this case would be futile; thus the exhaustion requirement, in its codified version at subsection 405(h), was waived by the court. See Salfi v. Weinberger, 373 F.Supp. 961, 964 (N.D. Cal. 1974).

16

at 2464-65.

The Supreme Court explained, however, that its ruling under subsection 405(h) did not bar the appellees from bringing their constitutional challenges before a United States district court. In fact, the Court noted that such a result would "raise[] a serious constitutional question of the validity" of subsection 405(h). Id. at 762, 95 S.Ct. at 2465 (distinguishing Johnson v. Robinson, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), and noting that such an "extraordinary" restriction on federal court jurisdiction over a constitutional claim would require "clear and convincing" evidence of congressional intent). The Court concluded that the appellees could still pursue their constitutional challenges through the administrative review process provided for in 42 U.S.C. § 405, appealing the Secretary's final decision to the federal district court under the explicit jurisdictional grant in subsection 405(g). See id. at 762-64, 95 S.Ct. at 2465-66. In fact, the Court subsequently held that it had jurisdiction over the appellees' personal claims under subsection 405(g) because they had previously exhausted their administrative remedies. See id. at 762-67, 95 S.Ct. 2465-68.

Body's claim is distinguishable from Salfi for several reasons. First, Body only has standing to bring this suit through operation of the qui tam provisions of the False Claims

17

Act. See 31 U.S.C. § 3730(b)-(h). Second, the FCA arguably provides the substantive basis of Body's suit as well; although BCBSA's application of the Medicare rules and regulations clearly would be determinative of whether false claims were, in fact, submitted, Body's claim is premised upon BCBSA's alleged knowing submission of fraudulent claims to the United States, and seeks to recover civil penalties as well as treble damages authorized by the FCA, not the Medicare Act. See 31 U.S.C. § 3729(a).[16] Finally, and most importantly, Body's suit could not go forward under the administrative review provisions prescribed by section 405(g). Body would not have standing to challenge BCBSA's benefits determination under section 1395ff. His application to the district court, therefore, represents his only avenue of obtaining any forum for his claim, rather than a strategic decision calculated at circumventing the administrative process.

The Court next analyzed the limited review provisions of the Medicare Act in United States v. Erika, Inc., 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12 (1982). The plaintiff in Erika brought a constitutional challenge to the amount of certain reimbursement

---

[16]    The damages and penalties that Body seeks to recover are quite different from the "benefits" sought by the appellees in Salfi. Body seeks damages on behalf of the government calculated as a multiple of benefits improperly paid out of government funds because of BCBSA's alleged fraud, as well as the statutory penalties authorized by subsection 3729(a), rather than reimbursement from the government for health services authorized under Medicare.

18

determinations under Medicare Part B before the Court of Claims, which held that it had jurisdiction under the Tucker Act. See id. at 205, 102 S.Ct. at 1653. On appeal, the Supreme Court did not address the proscriptive effect of subsection 405(h). See id. at 206 n.6, 102 S.Ct. at 1653 (noting that the Court did not reach the subsection 405(h) issue). The Court instead focused on the terms of subsection 1395ff(b), which, prior to 1987, explicitly provided for judicial review of eligibility determinations under Parts A and B, and for amount of benefits determinations under Part A, but "[c]onspicuously . . . fail[ed] to authorize further review for determinations of the amount of Part B awards." Id. at 208, 102 S.Ct. at 1654.[17]

Although the statute omitted any reference to judicial appeal of Part B amount determinations, it did not specifically forbid judicial review of those determinations either. The Erika Court found, however, that the legislative history demonstrated that the omission of a right of individuals dissatisfied with their Part B amount determinations to judicial review was more than just congressional oversight. The Court held that the

---

[17]  Until 1987, subsection 1395ff(b) only provided for review of Medicare Part B amount determinations in a hearing by the carrier, the Part B equivalent of a fiscal intermediary. The 1986 amendments to the Medicare Act made Part B amount determinations subject to judicial review, as provided by subsection 405(g), to the same extent as Part A amount determinations. See Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9341, 100 Stat. 1874, 2037 (1986) (amending section 1395ff).

history conclusively demonstrated that Congress intended no judicial review for Part B amount determinations under 1395ff because the amounts were expected to be much smaller than those under Part A, "quite minor matters" that Congress feared might overload the courts. See id. at 208-11, 102 S.Ct. at 1654-55 (discussing unambiguous statements to that effect in Senate and Conference Reports, as well as statements in the Congressional Record). The Court found that the express language of section 1395ff and the section's legislative history, taken together, provided sufficient evidence that Congress did not intend for amount determinations under Part B to be reviewable, and therefore held that the Court of Claims had no jurisdiction. See id. at 205-11, 102 S.Ct. at 1653-55.

Despite the fact that the Court's decision in Erika was premised on section 1395ff rather than on subsection 405(h), it demonstrates the Supreme Court's intent to respect the complex administrative scheme designed by Congress to implement old-age security programs: Medicare in Erika, and Social Security in Salfi. The Erika Court was even willing to forego any judicial review for beneficiaries dissatisfied with the amount of their benefits under Part B, but only because Congress' intent to preclude such review was clear. In contrast, there is no evidence that Congress, in making subsection 405(h) applicable to Medicare (or enacting it as part of the Social Security Act, for

that matter), intended to eliminate federal-question jurisdiction under section 1331 for FCA actions such as Body's.

The Supreme Court analyzed the application of subsection 405(h) to the Medicare Act for the first time in Heckler v. Ringer, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). In Heckler, four persons brought constitutional and statutory challenges against the policy of the Secretary of Health and Human Services not to pay for a special type of surgery intended to relieve respiratory distress, a type of surgery that had previously been covered under Medicare Part A. See id. at 604-07, 104 S.Ct. at 2013-18.[18] The plaintiffs sought declaratory and injunctive relief that would invalidate the Secretary's policy and compel her to instruct fiscal intermediaries to pay for the surgery, without requiring claimants to pursue their claims through the administrative process. Id. at 610-611, 104 S.Ct. at 2019. The district court dismissed their claims for lack of jurisdiction, holding "that 42 U.S.C. § 405(g) with its administrative exhaustion prerequisite provide[d] the sole avenue for judicial review," and that the plaintiffs had failed to exhaust their administrative remedies. Id. at 611-12, 104 S.Ct.

---

[18]     Judicial review of Medicare Part A amount determinations was always available under section 1395ff(b), following exhaustion of the administrative process and subject to amount-in-controversy requirements. See 42 U.S.C. § 1395ff. Only Part B amount determinations were unreviewable prior to 1986. See supra note 17 and accompanying text.

at 2019-20.  The Ninth Circuit reversed.  Id. at 612, 104 S.Ct. at 2020.

The Supreme Court reversed the Ninth Circuit, finding that the plaintiffs' claims for declaratory and injunctive relief were "inextricably intertwined" with their claims for benefits.  Id. at 614, 104 S.Ct. at 2021.  The Court stated, "it makes no sense to construe the claims of those three[19] respondents as anything more than, at bottom, a claim that they should be paid for their BCBR surgery."  Id.  Noting that it had construed the term "arising under" broadly in Salfi, the Court concluded that the plaintiffs' "benefits" claims "arose under" Medicare and, therefore, fell within the purview of subsection 405(h), notwithstanding the fact that they sought injunctive and declaratory relief rather than benefits.  "Following the declaration which respondents seek from the Secretary -- that BCBR surgery is a covered service -- only essentially ministerial details will remain before respondents would receive reimbursement."  Id. at 615, 104 S.Ct. at 2022.  Because the plaintiffs had not yet pursued their claims through the administrative process, the Court held that judicial review was

---

[19]    Unlike the other three, the fourth plaintiff had not yet had the surgery but challenged the policy because, he claimed, its existence precluded his having the surgery.  Id. at 620, 104 S.Ct. at 2024.  The Court dismissed the fourth plaintiff's claim as well because it, too, was "essentially one requesting the payment of benefits for . . . surgery, a claim cognizable only under § 405(g)."  Id.

22

unavailable under subsection 405(g) and that subsection 405(h) foreclosed the district court's federal-question jurisdiction under section 1331. See id. at 616-19, 104 S.Ct. at 2022-24. Thus the district court's dismissal was appropriate.

The Supreme Court discerned a cleverly concealed claim for benefits behind the plaintiffs' constitutional and statutory challenges. As in Salfi, the Court found that section 405(g) provided an adequate remedy for each of the plaintiffs, concluding:

> Although respondents would clearly prefer an immediate appeal to the District Court rather than the often lengthy administrative review process, exhaustion of administrative remedies is in no sense futile for these respondents, and they, therefore, must adhere to the administrative procedure which Congress has established for adjudicating their Medicare claims.

Id. at 619, 104 S.Ct. at 2024. Heckler provides clear evidence that subsection 405(h) is meant to protect the integrity of the Medicare administrative scheme, "to prevent 'premature interference with agency processes' and to give the agency a chance 'to compile a record which is adequate for judicial review.'" Id. at 619 n.12, 104 S.Ct. at 2024 (quoting Salfi, 422 U.S. at 765, 95 S.Ct. at 2466). That these justifications are inapposite in a case such as Body's, which is not cognizable in the administrative scheme, aptly demonstrates why subsection 405(h) is inapplicable to claims brought against a fiscal intermediary under the False Claims Act. A look at the most

23

recent Supreme Court case to address the application of subsection 405(h) reinforces this view.

In Bowen v. Michigan Academy, 476 U.S. 667, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), the Court reviewed a statutory challenge to administrative regulations promulgated under Medicare Part B. The challenged regulations provided for different benefits payments for similar physicians' services. The case presented the Court with two issues. First, the Court considered whether the pre-1987 version of 1395ff, which did not provide for judicial review of amount determinations under Part B, see supra note 17 and accompanying text, implicitly precluded judicial review of a challenge to regulations controlling the amount of benefits paid. Alternatively, the Court examined whether subsection 405(h) worked as a bar to the district court's jurisdiction over such a challenge.

The Court began its analysis by noting the "strong presumption that Congress intends judicial review of administrative action," Id. at 670, 106 S.Ct. 2135, a presumption that may only be overcome by "a showing of 'clear and convincing evidence' of a contrary legislative intent . . . ." Id. at 671, 106 S.Ct. at 2136 (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967)).[20] Turning to

---

[20] The Court concluded that "[t]he presumption of judicial review is, after all, a presumption, and like all presumptions used in interpreting statutes, may be overcome by, inter alia,

24

the question of whether the omission of any specific authorization of administrative or judicial review of Part B amount determinations in section 1395ff impliedly precluded the district court from hearing a challenge to the regulations, the Court found that "[s]ection 1395ff on its face is an explicit authorization of judicial review, not a bar." Id. at 674, 106 S.Ct. at 2137. Contrasting a challenge to the administrative regulations governing Medicare Part B with the claim brought in Erika, the Court stated:

> The reticulated statutory scheme, which carefully details the forum and limits of review of "any determination . . . of . . . the amount of benefits under part A," 42 U.S.C. § 1395ff(b)(1)(C) (1982 ed., Supp. II), and of the "amount of . . . payment" of benefits under Part B, 42 U.S.C. § 1395u(b)(3)(C), simply does not speak to challenges mounted against the method by which such amounts are to be determined rather than the determinations themselves.

Id. at 675, 106 S.Ct. at 2138 (omissions in original). Therefore, the Court concluded, "those matters which Congress did not leave to be determined in a 'fair hearing' conducted by the carrier -- including challenges to the validity of the Secretary's instructions and regulations -- are not impliedly insulated from judicial review by 42 U.S.C. § 1395ff." Id. at

specific language or specific legislative history that is a reliable indicator of congressional intent, or a specific congressional intent to preclude judicial review that is 'fairly discernible in the detail of the legislative scheme." Id. at 673, 106 S.Ct. at 2137 (quoting Block v. Community Nutrition Institute, 467 U.S. 340, 349, 351, 104 S.Ct. 2450, 2456, 2457, 81 L.Ed.2d 270 (1984)) (internal quotation marks omitted).

678, 106 S.Ct. at 2140.

The Court next addressed the contention that the third sentence of subsection 405(h) serves as a bar to federal-question jurisdiction in the district courts over challenges to administrative regulations governing Medicare Part B. First noting the implausibility of Congress' providing carrier review of "trivial" amounts determinations while simultaneously denying any review of "statutory and constitutional challenges to regulations promulgated by the Secretary," the Court concluded again that Congress only intended to foreclose judicial review of amount determinations when it promulgated subsection 405(h). Id. at 678-80, 106 S.Ct. at 2140-41. "[M]atters which Congress did not delegate to private carriers, such as challenges to the validity of the Secretary's instructions and regulations, are cognizable in courts of law." Id. at 680, 106 S.Ct. at 2141 (emphasis added).[21]

---

[21]     Notably, the Supreme Court implicitly endorsed our view that subsection 405(h) is intended to ensure that beneficiaries do not evade the administrative process described in section 405, rather than to establish a broad preclusion of federal-question jurisdiction over all actions related to Medicare benefits, such as Body's claim under the FCA. To support its conclusion that subsection 405(h) did not block the plaintiffs' statutory challenge to the Medicare regulatory scheme, the Court referred to the legislative history of section 1395ff, specifically Senator Bennett's remarks connected to the 1972 amendments to that section, wherein Bennett stated that the amendments were meant to clearly demonstrate that Congress intended to preclude judicial "review only of 'amount determinations' -- i.e., those 'quite minor matters,' remitted finally and exclusively to adjudication by private insurance carriers in a 'fair hearing.'"

26

Perhaps most clearly of the four Supreme Court cases analyzing the jurisdictional limitations contained in the Medicare Act, Bowen demonstrates that subsection 405(h), viewed within the context in which it was drafted and made applicable to Medicare, simply seeks to preserve the integrity of the administrative process Congress designed to deal with challenges to amounts determinations by dissatisfied beneficiaries, not to serve as a complete preclusion of all claims related to benefits determinations in general.

C.

In every case discussed in subpart B, the Supreme Court was faced with a suit by a beneficiary -- a person or an organization that wanted, ultimately, to receive money from the government for health services. The Court scrutinized each plaintiff's claim to determine whether the plaintiff was simply seeking benefits, a

---

Id. at 680, 106 S.Ct. at 2141 (citing 118 Cong. Rec. 33992 (1972)(remarks of Senator Bennett)). From those remarks, the Court inferred that subsection 405(h) was not intended to preclude the district courts from hearing cases not cognizable before carriers, presumably because the subsection's role was limited to ensuring that the hearing and appeal procedures under section 405 were utilized. See id. at 680-81 & n.10, 106 S.Ct. at 2141 (noting in footnote that "the legislative history summarized in the preceding section speaks to provisions for appeal generically, and is thus as probative of congressional intent in enacting § 1395ii as it is of § 1395ff" (citations omitted) (emphasis added)). Therefore, federal-question jurisdiction was available for the plaintiffs' statutory challenge.

27

claim cognizable within the administrative scheme designed by Congress, or was bringing a claim for which administrative review was unavailable. Cleverly concealed claims for benefits, veiled attempts to evade the sometimes tedious administrative process, were dismissed, see Heckler, 466 U.S. at 626-27, 104 S.Ct. at 2027-28; Erika, 456 U.S. at 206-11, 102 S.Ct. at 1653-55; Cf. Salfi 422 U.S. at 756-62, 95 S.Ct. at 2462-65 (finding that subsection 405(h) blocked federal-question jurisdiction but that the claimants had effectively exhausted their administrative remedies and could pursue their claims under the jurisdictional grant in subsection 405(g)), enabling the Secretary of Health and Human Services to get the "first crack" at interpreting HHS rules and regulations, as Congress intended. See Heckler, 466 U.S. at 619 n.12, 104 S.Ct. at 2024; Salfi, 422 U.S. at 765, 95 S.Ct. at 2466. In the one instance in which a challenge from a potential beneficiary was neither specifically prohibited by the Act nor cognizable in the administrative process, the Supreme Court held that subsection 405(h) did not, by its terms, bar federal-question jurisdiction under section 1331. See Bowen, 476 U.S. at 678-681, 106 S.Ct. at 2140-41.

In sum, the Supreme Court has sought to prevent claimants from circumventing the administrative framework designed by Congress to execute the Medicare Act by creatively styling their claims as collateral attacks not "arising under" Medicare and

thus not subject to subsection 405(h).  The Supreme Court has not

sought, however, to extend the reach of subsection 405(h) to bar

claims that, although they may implicate benefits determinations,

are certainly not veiled claims for benefits by a disgruntled

beneficiary that could have, and should have, been pursued

administratively in the first instance.[22]

---

[22]     The district court in this case relied primarily on its
interpretation of the Seventh Circuit's opinion in Bodimetric
Health Services, Inc. v. Aetna Life & Casualty, 903 F.2d 480 (7th
Cir. 1990), and that court's interpretation of Supreme Court
precedent, in determining that Body's claim "arose under" the
Medicare Act and was, therefore, subject to the jurisdiction-
stripping provision of subsection 405(h).  The court of appeals
in Bodimetric, depending largely on its interpretation of the
Supreme Court's decisions in Erika and Bowen, distinguished
between "two types of Medicare claims: challenges to the amount
of benefits to be paid[, which] are not reviewable, . . . [and]
challenges to the regulatory scheme under which the amount of
benefits is calculated[, which] are reviewable."  Bodimetric, 903
F.2d at 485.
     The district court in the instant case found the logic of
Bodimetric quite persuasive.  It held that Body's claims "more
closely resemble[] a determination of benefits dispute," and,
therefore, that "it [was] without subject matter jurisdiction
over the Complaint."  Although it is true that the issues in this
case are more closely related to benefits determinations than to
challenges to the regulatory scheme set up by the Secretary of
Health and Human Services (in fact, Body claims that BCBSA
misapplied valid regulations), the district court's reliance upon
the Erika-Bowen distinction drawn in Bodimetric is misplaced.
     At the time that Erika and Bowen were decided, the Medicare
Act did not provide for review of Part B decisions beyond a "fair
hearing" before the carrier administrating the program.  The 1986
amendments to the Medicare Act made Part B claims reviewable to
the same extent as Part A claims.  See supra note 17 and
accompanying text.  Most courts considering the question,
including this court in American Academy of Dermatology v.
Department of Health & Human Services, 118 F.3d 1495 (11th Cir.
1997), have held that the 1986 amendments extinguished the
"amount/methodology distinction established in [Bowen v.]
Michigan Academy."  Id. at 1500; see, e.g., Martin v. Shalala, 63

We are not faced with a claim for benefits from a dissatisfied Medicare beneficiary, nor are we faced with a claim cognizable within the administrative framework provided in section 405.  We are faced with a claim by a former employee of a fiscal intermediary alleging fraud against the United States government.  BCBSA would have us hold that subsection 405(h) blocks the district court's federal-question jurisdiction over such a case (and that no other jurisdictional basis for the case exists), and that, therefore, Body's claim should be dismissed for lack of subject matter jurisdiction.  Dismissal of Body's

_____

F.3d 497, 502-03 (7ᵗʰ Cir. 1995) ("As a result of the 1986 Amendments . . . the Michigan Academy distinctions drawn between 'amount of payment' and 'validity of the statute and regulations' challenges are no longer meaningful or necessary."); Farkas v. Blue Cross & Blue Shield of Michigan, 24 F.3d 853, 860 (6ᵗʰ Cir. 1994) (rejecting argument that amount/methodology distinction is "good law" and stating that 1986 amendments "deprived Michigan Academy of lasting precedential value"); Abbey v. Sullivan, 978 F.2d 37, 41-43 (2d Cir. 1992) (amendments have relegated distinction to irrelevance); National Kidney Patients Ass'n v. Sullivan, 958 F.2d 1127, 1132-33 (D.C. Cir. 1992) (same). To hold otherwise, the Erika-Bowen distinction would have to be applied to challenges to the regulations and statutes governing Part A claims as well (as the Seventh Circuit erroneously did in Bodimetric), meaning Bowen, sub silentio, "overruled [Ringer and] the entire line of Supreme Court cases that has [required exhaustion and] denied direct federal-question jurisdiction to claims under Part A."  American Academy, 118 F.3d at 1500 (alterations in original) (quoting Farkas, 24 F.3d at 860).
        We rely today on an entirely different distinction: the distinction between a case brought by a beneficiary, who ultimately wants funds from the government and may challenge adverse decisions through the administrative process, and a case brought by a qui tam relator under the False Claims Act, who seeks to recover money erroneously paid by the government, a claim not cognizable in the administrative scheme.

claim on that ground, however, would have an anomalous result: the government could bring an FCA claim against BCBSA under the jurisdictional grant in 28 U.S.C. § 1345, but the qui tam provisions of the FCA would be rendered useless.  The FCA's incentives for informed agents to monitor their employers and bring suit for violations would thus be destroyed.  We do not believe that this result is either necessary or correct.

Although a number of benefits determinations are at issue in this suit, and although treble damages under the FCA bear a direct relation to the amount of overpayment of benefits, this claim is simply not the type of claim that subsection 405(h) was intended to prevent.  Hence, we conclude that subsection 405(h) does not bar federal-question jurisdiction over a claim brought against a fiscal intermediary under the False Claims Act.  Such a claim, for purposes of subsection 405(h), arises under the False Claims Act, not the Medicare Act, and federal-question jurisdiction under section 1331 is available.

III.

Our inquiry does not end with our holding that subsection 405(h) is inapplicable to Body's qui tam suit against BCBSA. Notwithstanding the district court's subject matter jurisdiction over the matter, BCBSA argues that it is immune from suits of this sort under 42 U.S.C. § 1395h(i)(3) (1994).  Although the

31

district court did not address the subsection 1395h(i)(3) immunity issue in its opinion dismissing the case, the issue was raised by BCBSA and was briefed by both parties before this court. We thus consider the issue as an alternative basis for affirming the district court's dismissal of the action. See Bonanni Ship Supply, Inc. v. United States, 959 F.2d 1558, 1561 (11th Cir. 1992) (holding that "this court may affirm the district court where the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted or rejected by the district court").

Subsection 1395h(i) has never been authoritatively construed by the federal courts. This case, therefore, presents a matter of first impression for this court.[23] We do not interpret the subsection in the abstract, however: Like subsection 405(h) discussed in part II, subsection 1395h(i)(3) must be read and understood in context.

First and foremost, subsection 1395h(i)(3) appears as part of subsection 1395h(i), entitled "Liability of certifying and disbursing officers designated under agreement for negligent, etc. payments." Subsection 1395h(i) reads:

---

[23] To our knowledge, the subsection has only been cited by one court since it was first enacted in 1965. See Mount Sinai Hosp. of Greater Miami, Inc. v. Weinberger, 376 F.Supp. 1099, 1127 (S.D. Fla. 1974) (simply citing the subsection (then denominated subsection 1395h(g)) for the proposition that its limits on the liability of government agents and officers are a departure from common law).

32

(1) No individual designated pursuant to an agreement under this section as a certifying officer shall, in the absence of gross negligence or intent to defraud the United States, be liable with respect to any payments certified by him under this section.

(2) No disbursing officer shall, in the absence of gross negligence or intent to defraud the United States, be liable with respect to any payment by him under this section if it was based upon a voucher signed by a certifying officer designated as provided in paragraph (1) of this subsection.

(3) No such agency or organization [such as a fiscal intermediary] shall be liable to the United States for any payments referred to in paragraph (1) or (2).

42 U.S.C. § 1395h(i). Subsection 1395h(i)(1) limits the liability of fiscal intermediary employees responsible for certifying claims for payment from beneficiaries, protecting them from liability for, in effect, mistaken (negligent) certifications, while retaining the certifying officers' individual liability for grossly negligent or fraudulent certifications. Subsection 1395h(i)(2) similarly limits the individual liability of the disbursing officers of fiscal intermediaries for making mistaken or negligent payments, but only if they do so based upon a certifying officer's voucher, and only in the absence of fraud or gross negligence.

In contrast to the limited immunity accorded to certifying and disbursing officers, subsection 1395h(i)(3) broadly states that the fiscal intermediaries themselves will not be liable to the Government for any of the payments referred to in paragraphs (1) and (2) -- that is, payments certified by certifying officers

33

and disbursed by disbursing officers.  A clause limiting immunity to payments not involving gross negligence or fraud is conspicuously absent.  When the language of a statute is unambiguous, we are bound to give it its plain meaning, absent "a clearly expressed legislative intent to the contrary."  United States v. Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (quoting Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)); see also United States v. Grigsby, 111 F.3d 806, 816 (11th Cir. 1997).  Subsection 1395h(i)(3) purports to give fiscal intermediaries full immunity from liability for payments that are certified by its certifying officers and issued by its disbursing officers, and we are not persuaded that Congress did not intend this immunity to extend to fraudulent payments certified and disbursed to Medicare Part A providers. Cf. Erika, 456 U.S. at 207-08, 102 S.Ct. at 1653-54 (finding that Congress' failure to grant judicial review of Part B amount determinations in the pre-1986 version of 1395ff, while simultaneously granting review of amount determinations under Part A and of eligibility determinations under Parts A and B, "provides persuasive evidence that Congress deliberately intended to foreclose further review of such claims").[24]

---

[24]    We are mindful of the brief statement in the Conference Committee's report that subsection 1395h(i)(3) is intended to grant fiscal intermediaries "the same immunity from liability for

34

Our reading of the subsection is consistent with the broader goals of section 1395h and the efficient administration of the Medicare system. Fiscal intermediaries, such as BCBSA, function much like an administrative agency. They "act on behalf of the Secretary, carrying on for [her] the governmental administrative responsibilities imposed by the [Medicare Act]." Sen. Rep. No. 404 (1965) reprinted in 1965 U.S.C.C.A.N. 1943, 1995 (adding that "[t]he Secretary, however, would be the real party in interest in the administration of the program"). In recognition of their administrative role, the Medicare regulations require that contracts with fiscal intermediaries "contain clauses providing for indemnification with respect to actions taken on behalf of HCFA," 42 C.F.R. § 421.5(b) (1997), and the federal courts have extended the doctrine of sovereign immunity to them. See Matranga v. Travelers Ins. Co., 563 F.2d 677, 677-78 (5th Cir. 1977) (justifying extension of the doctrine because the United States is the real party in interest); Peterson v. Blue Cross/Blue Shield of Texas, 508 F.2d 55, 57-58 (5th Cir. 1975). Rather than impose liability on fiscal intermediaries for the vast amounts of federal money their agents certify and disburse to Medicare providers, a task delegated by the HCFA, Congress

---

incorrect payments as would be provided their certifying and disbursing officers." H.R. Conf. Rep. No. 682 (1965), reprinted in 1965 U.S.C.C.A.N. 2228, 2231. This brief and inconclusive statement is insufficient to overcome the clear language of the subsection.

35

established provisions providing for recoupment of overpayments from the actual recipients of the funds. See 42 U.S.C. § 1395gg; see also 42 C.F.R. §§ 405.301-405.378 (1997) (specifying method for recouping overpayments from providers).

This system of allocating liability for erroneous Medicare payments does not leave the government without any remedies for punishing Medicare fraud. Not only can the government recoup incorrect payments, it can certainly bring an FCA action against the recipient of the funds if that recipient participated in the scheme.[25] The government could also bring an action against the actual persons in the fiscal intermediary organization who executed the fraudulent scheme -- the certifying officers and disbursing officers who paid out the government's money in knowing contravention of Medicare guidelines. The government's inability to bring an FCA action against the intermediary does not mean it will have no recourse to deep pockets either. By allowing the government to require surety bonds for intermediary employees, subsection 1395h(h) implicitly acknowledges that fiscal intermediary employees handling the government's cash will

---

[25]    We would imagine that provider complicity would be evident in almost every instance where Medicare claims are fraudulently certified and paid to providers. Otherwise, the fiscal intermediary's agents certifying and disbursing United States Government funds are simply performing unacknowledged acts of charity, because they cannot directly benefit from the payments they have fraudulently certified and disbursed to unwitting, albeit happily enriched, providers.

be in a position to pilfer.  <u>See</u> 42 U.S.C. § 1395h(h).

Fiscal intermediary immunity from liability to the United States for payments certified and disbursed by its officers in the normal course of business also does not preclude the government from seeking recourse against recalcitrant intermediaries.  Most obviously, the government can terminate the contract of an intermediary if "the continuation of some or all of the functions provided for in the agreement with the [fiscal intermediary] is <u>disadvantageous</u>," 42 U.S.C. § 1395h(g) (emphasis added), much less if the government detects intentional disobedience to Medicare rules and regulations.  <u>See also</u> 42 C.F.R. §§ 421.120 (intermediary performance criteria), 421.122 (performance standards), 421.124 (intermediary's failure to perform efficiently and effectively), 421.126 (termination of intermediary agreements) (1997).  Fiscal intermediaries would also be liable for any money pilfered directly by the intermediary from government funds, such as government cash illegally siphoned into the intermediary's own accounts or charges to the government for services the intermediary did not perform, because its immunity extends only to payments to Medicare beneficiaries certified by certifying officers and disbursed by disbursing officers.[26]  Finally, if the government

---

[26]    <u>Cf.</u> <u>United States ex rel. Flynn v. Blue Cross/Blue Shield of Michigan</u>, (D. Md. 1995).  <u>Flynn</u> involved a settlement agreement between the government and Blue Cross/Blue Shield of

discovered rampant fraud and abuse of Medicare by a fiscal

intermediary, we do not doubt that it could find sufficient civil

and criminal grounds to punish the fiscal intermediary and its

officers, and/or recoup any lost money.  Cf. Flynn,(detailing

terms of massive settlement between BCBSM and the government for

BCBSM's fraud).

Body's action under the False Claims Act is premised upon

precisely the types of payments for which Congress provided the

fiscal intermediaries with immunity.  There is nothing in Body's

complaint to suggest that the payments were not made in the

normal course of reimbursing Alabama hospitals for costs

attributable to Medicare patients, that is, payments certified

and disbursed to the providers.  In fact, it appears that Body

himself was the certifying officer.[27]  Although Body could argue

_____

Michigan ("BCBSM").  Therefore, we do not cite the case for its
legal conclusions about liability under the FCA, because there
are none.  The case does describe, however, the type of fiscal
intermediary fraud for which we do not believe section
1395h(i)(3) would provide immunity.

In Flynn, the government, by relator Darcy Flynn, brought an
FCA action against BCBSM because the intermediary was not
performing audits for which it was being paid by the government,
causing the government to pay BCBSM for phantom services, in
addition to costing the government money it would have recovered
had the audits been performed.  Id. at *6.  By the time of the
settlement, BCBSM was no longer either a fiscal intermediary or
carrier for Medicare in Michigan, and it agreed to pay the
government $27,600,000 to settle the claims.  Id. at *8.

[27]     Body claims that his unnamed "superiors" ordered him to
certify the payments to Baptist and Carraway.  If he were
actually coerced to certify the payments, and the payments were
fraudulent, those superiors may be liable under the FCA, because

38

that he does not seek to impose liability for "payments" as meant in subsection 1395h(i)(3), but rather for statutory penalties and treble damages for violations of the FCA, that argument would be unavailing. We cannot ignore that Body's suit would be premised upon payments for which subsection 1395h(i)(3) provides BCBSA immunity.[28] Allowing Body to circumvent that immunity by appeal to the False Claims Act would destroy the integrity of the system that Congress designed. BCBSA, therefore, is immune from Body's suit.

## IV.

For the foregoing reasons, we hold that the district court erred in dismissing Body's suit for lack of subject matter jurisdiction. We also hold, however, that Body has not stated a claim for which relief can be granted because, under 42 U.S.C. §

---

they would have essentially usurped his certifying function. We express serious doubt, however, that Body (or the government) could succeed on such a claim. The payments made to Alabama hospitals were not concealed from the government; the Secretary of Health and Human Services could have pursued the recoupment of the money, but chose not to; and, even after the OIG investigation, almost all of BCBSA's determinations were upheld. Given these facts, it is highly unlikely that Body could succeed in proving that BCBSA, or any of its officers, defrauded the United States government.

[28] Body's suit seeks recovery for the United States under the <u>qui tam</u> provisions of the FCA, not recovery for Body personally. Thus any argument subsection 1395h(i)(3) does not apply because Body does not seek to impose liability "to the United States" would be similarly unavailing.

39

1395h(i)(3), BCBSA is immune from liability to the United States for the payments it made to Alabama hospitals.[29]  The district court's dismissal is thus

AFFIRMED.

---

[29]    We note briefly that given our holding that BCBSA is immune from liability under subsection 1395h(i)(3), Body's suit is properly dismissed under Federal Rule of Civil Procedure Rule 12(b)(6), for failure to state a claim upon which relief can be granted, rather than Rule 12(b)(1) for lack of subject matter jurisdiction.