[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 28, 2003
THOMAS K. KAHN
CLERK

No. 01-14291
Non-Argument Calendar

D. C. Docket No. 00-02521-CV-FAM

UNITED STATES OF AMERICA, ex rel.,

VALENTIN SARASOLA,
MARIO CARDOSO, qui tam,

Plaintiffs-Appellees,

versus

AETNA LIFE INSURANCE COMPANY, a
foreign corporation,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Florida

**(January 28, 2003)**

Before TJOFLAT and KRAVITCH, Circuit Judges, and DOWD[*], District Judge.

TJOFLAT, Circuit Judge:

In United States ex rel. Body v. Blue Cross & Blue Shield of Alabama, Inc., 156 F.3d 1098 (11th Cir. 1998), we held that an insurance company occupying the role of "fiscal intermediary" in processing Medicare Part A claims is immune from liability, under 42 U.S.C. § 1395h(i)(3), in a *qui tam* suit brought under the False Claims Act, 31 U.S.C. § 3729(a), for knowingly approving false or fraudulent Part A claims for payment by the United States government. The interlocutory appeal in this *qui tam* action presents the question of whether such immunity bars a claim that the fiscal intermediary breached its obligation to audit the records of a Medicare service provider.

## I.

## A.

Medicare is a federal health insurance program for the aged and disabled. 42 U.S.C. §§ 1395 et seq. Administered by the Centers for Medicare & Medicaid Services ("CMS"),[1] a division of the Department of Health and Human Services

---

[*] Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

[1] CMS is the successor to Health Care Financing Administration ("HCFA"). 42 C.F.R. § 400.200. Although the events that gave rise to the instant litigation occurred while HCFA was administering the Medicare program, for sake of continuity we refer to HCFA as CMS

("HHS"), Part A provides benefits for "hospital, related post-hospital, home health services, and hospice care." Id. § 1395c. To participate in the Medicare program, a health care provider must enter into an agreement ("Provider Agreement") with the Secretary of HHS ("Secretary"). Id. § 1395cc. After entering into such an agreement, the provider is reimbursed directly for the reasonable cost of services provided to Medicare patients.

CMS fulfills its administrative duties under Part A by contracting with third parties – typically large private insurance companies – to serve as fiscal intermediaries. See id. § 1395h. The fiscal intermediaries have one central function: reimburse providers for the reasonable cost of health care services on behalf of Medicare beneficiaries. Id. §§ 1395h, 1395u. In carrying out this function, the fiscal intermediaries are obligated to audit the records of health care providers "as necessary" to ensure that proper payments are made. 42 C.F.R. § 421.100(c); see also 42 U.S.C. § 1395h(a).

To understand how the auditing function fits within a fiscal intermediary's duties, it is necessary to understand how the reimbursement scheme operates.[2]

_____

throughout this opinion.

[2] Recent changes to the Medicare statute altered the reimbursement scheme as it pertains to home health services in particular. See 42 U.S.C. § 1395fff. The statute directs the Secretary of HHS to develop a prospective payment scheme for home health services to replace the cost reimbursement scheme described in our

3

After providing health care services to a Medicare beneficiary, the provider files a claim for reimbursement with the fiscal intermediary. The intermediary, in turn, reimburses the provider "as often as possible," 42 § C.F.R. 413.60(c), and on a "most expeditious schedule," id. § 413.64(a). Accordingly, fiscal intermediaries make pre-audit payments known as periodic interim payments ("PIPs") at least monthly. 42 U.S.C. § 1395g(e); 42 C.F.R. § 413.60. The PIP amount is an estimate derived from projections of the services the provider is likely to render in the current fiscal year ("FY").[3] These PIPs are necessary to enable the providers to continue day-to-day operations and avoid the cash-flow shortage that would stem from a prolonged delay between the time a service is provided to a beneficiary and the time the provider is reimbursed for the service. See River Garden Hebrew Home for the Aged v. Califano, 507 F. Supp. 221, 223 (M.D. Fla. 1980). PIPs usually account for the bulk of the providers' receipts in any given fiscal year.

---

opinion. Id. The prospective payment scheme reimburses home health agencies by a predetermined amount instead of on a reasonable cost basis. According to the statute, the prospective payment scheme would take effect for cost reporting periods beginning on or after October 1, 1999 (subsequently amended to October 1, 2000), with provisions for up to a four-year transition period. See id. Thus, the reimbursement scheme described in our opinion today was in effect for home health services during the time period from which the claims before us arise. It remains in effect for other health care services reimbursed under Medicare Part A.

[3] The projections are based on the historical level of service for the provider (and other adjustments). 42 C.F.R. § 413.64(e).

A reconciliation process begins at the end of a provider's fiscal year to determine whether the provider was overpaid or underpaid for its *actual* costs as a result of the *estimated* PIPs. To begin, the provider is required to submit a fiscal year-end cost report that details the costs incurred for Medicare beneficiaries. 42 C.F.R. §§ 413.20, 413.24(f). Absent obvious errors, the fiscal intermediary assumes the cost report to be correct and makes "an initial retroactive adjustment." Id. § 413.64(f)(2). The adjustment "bring[s] the interim payments made to the provider during the . . . [previous year] into agreement with the reimbursable amount payable to the provider for the services furnished to program beneficiaries . . . ." Id. § 413.64(f)(1). If the provider was underpaid during the year, the fiscal intermediary remits the appropriate amount to the provider. On the other hand, if the provider was overpaid, the provider either returns the overpayment amount or the fiscal intermediary adjust downward the provider's current-year PIP payments to recoup the overpayment. See id. § 405.1803(c). The fiscal intermediary thereafter conducts an audit of the provider's year-end cost report and issues a notice setting forth the total amount of reimbursement due under the program. Id. § 405.1803(a). A final retroactive adjustment is made to account for any outstanding overpayment or underpayment. See id. § 413.64(f)(2).

Because the reimbursement scheme calls for estimated payments based on a

5

provider's representations, the auditing function is a critical part of the overall scheme to administer Part A of Medicare. The Medicare statute requires the Secretary to develop standards, criteria, and procedures for evaluating the overall performance of fiscal intermediaries. As part of this performance evaluation, fiscal intermediaries are judged in part for their ability to make "[c]orrect coverage and payment determinations." 42 C.F.R. § 421.120(a)(1).

In carrying out its functions, a fiscal intermediary is shielded in part from lawsuits by a grant of statutory immunity. The immunity section provides:

> (1) No individual designated pursuant to an agreement under this section as a certifying officer shall, in the absence of gross negligence or intent to defraud the United States, be liable with respect to any payments certified by him under this section.

> (2) No disbursing officer shall, in the absence of gross negligence or intent to defraud the United States, be liable with respect to any payment by him under this section if it was based upon a voucher signed by a certifying officer designated as provided in paragraph (1) of this subsection.

> *(3) No such agency or organization shall be liable to the United States for any payments referred to in paragraph (1) or (2).*

42 U.S.C. § 1395h(i) (emphasis added).

## B.

Until its dissolution in 1995, St. Johns Home Health Agency, Inc. ("St.

Johns"), a Florida not-for-profit corporation, operated as a home health agency under a Florida license. Arnold Friedman was its chief executive officer. In 1976, St. Johns entered into a Provider Agreement with CMS[4] to act as a provider of home health services to homebound patients under Part A of the Medicare Program. The home health services rendered by St. Johns included skilled nursing care, physical therapy, occupational and speech therapy, medical social services, and home health aides' services.

In July 1982, Aetna Life Insurance Company ("Aetna") entered into a contract with CMS to serve as the fiscal intermediary for the State of Florida. As such, Aetna was responsible for fulfilling the supervisory and administrative responsibilities set forth in the Medicare Act and accompanying federal regulations. Thus, Aetna was responsible for processing and disbursing payments to St. Johns for services rendered in the form of the bi-weekly PIPs, and also for conducting necessary audits and making appropriate adjustments for overpayment or underpayment to St. Johns.

C.

Before turning to the *qui tam* case before us, it is necessary to understand the

---

[4] As noted *supra*, the Centers for Medicare & Medicaid Services is the division of HHS that administers the Medicare program and was known at the time of its contracting with St. Johns as the Heath Care Financing Administration.

history of the relationship between St. Johns, Aetna, and CMS. During 1992 and 1993, Aetna and St. Johns were in substantial disagreement over the dollar amount of the Medicare reimbursements St. Johns was entitled to receive during FYs 1990 through 1993.[5] In 1992, Aetna issued a notice, indicating that St. Johns had been overpaid nearly $2.8 million for FYs 1990 and 1991, which St. Johns contested. Because of overpayment, Aetna altered the formula by which it calculated St. Johns's PIPs for FY 1993. After St. Johns complained about the new formula, Aetna made a lump-sum payment in January 1993 to compensate for the lower PIPs St. Johns received during the first half of FY 1993. In July 1993, Aetna advised St. Johns that it was "skeptical" that St. Johns had, in fact, made all of the home health care visits that it had claimed during FY 1993 and, furthermore, would not recognize certain "transcription" charges as reasonable, and thus reimbursable, under the Medicare program.

On September 15, 1993, St. Johns brought suit in the United States District Court for the Middle District of Florida against Aetna and the Secretary of HHS, seeking a writ of mandamus, injunctive relief, and damages.[6] The gist of St.

_____

[5] St. Johns's fiscal years ran from July 1 to June 30. Thus, FY 1990 ran from July 1, 1989 to June 30, 1990.

[6] Case No. 93-1608-CIV-T. St. Johns's 1993 complaint is part of the record of the proceedings in the *qui tam* suit Relators brought in 1995 against Aetna and

8

Johns's complaint, which was framed in three counts, was that Aetna, in collaboration with the Secretary, had been arbitrarily withholding PIPs over a substantial period of time,[7] and that Aetna had been unduly late in completing its adjustments to St. Johns's cost reports for FYs 1990 and 1991 and in issuing its NPR for FY 1992, thereby violating the Medicare statutes and regulations as well as the substantive and procedural components of the Due Process Clauses of the Fifth and Fourteenth Amendments.

St. Johns asked the court, in Count I, to issue a preliminary and permanent injunction restraining the defendants from withholding from its PIPs reimbursements costs it had incurred in rendering covered services to program

_____

St. Johns in the Southern District of Florida, Case No. 95-1278-CIV-MORENO, as described in the text infra. The instant *qui tam* suit is a continuation of that lawsuit. For that reason, we supplemented the record on appeal in the instant case with the record of the proceedings before the district court in Case No. 95-1278-CIV-MORENO.

[7] The complaint alleged that, on July 22, 1993, Aetna informed St. Johns that it was withholding the PIPs because, among other things, it was "skeptical that St. Johns had in fact made [the] 1,150,000 Medicare home health visits in FY 1993" it claimed to have made. Such withholding, the complaint continued, was depriving St. Johns of badly needed operating capital.
An affidavit executed on October 13, 1995 by the Section Chief in the Payment and Recovery Branch, Division of Medicare, of CMS's Regional Office in Atlanta, and subsequently filed in the case, indicates that CMS agreed with Aetna's decisions regarding St. Johns's costs reimbursements, and that Aetna's Program Integrity Unit had notified CMS that its investigation indicated that many of St. Johns's claims for reimbursement may be fraudulent.

9

beneficiaries, and to award it damages and other appropriate relief. In Count II, St. Johns asked the court to issue a writ of mandamus directing the defendants to "comply with the Medicare statutes and regulations and to reimburse . . . $3.9 million for costs that [they are] wrongfully withholding . . . ." In Count III, St. Johns asked for the same coercive relief sought in Counts I and II and damages for the defendants' infringement of St. Johns's substantive and procedural due process rights.

On August 23, 1993, while its suit was pending, St. Johns sought Chapter 11 relief in the bankruptcy court for the Southern District of Florida. Immediately after filing its Chapter 11 petition, St. Johns, as debtor in possession, filed an emergency motion for authority to assume, as an executory contract, its Provider Agreement with the Secretary pursuant to 11 U.S.C. § 365. The Secretary opposed the motion on the grounds that St. Johns "ha[d] not adequately proposed a means of curing existing defaults or providing adequate assurance of future performance under . . . § 365," and that the court did not have "jurisdiction over [CMS]'s calculation of amounts owed under the Medicare program or recovery of overpayments made pursuant thereto until a provider has exhausted its administrative remedies, pursuant to 42 U.S.C. § 405(h)."

The court denied St. Johns's motion in a written order dated September 23,

1994.[8] It agreed with the Secretary that it lacked jurisdiction to entertain the motion because St. Johns had not exhausted its administrative remedies. Assuming that it had jurisdiction, the court added, it could not "grant effective relief . . . under 11 U.S.C. § 365 without fundamentally and impermissibly altering the contractual relationship between St. Johns and the Secretary which incorporates the statutory and administrative scheme imposed by the Medicare Program."

The court's decision was St. Johns's death knell. On November 10, 1994, the court entered an order approving the sale of St. Johns's assets (except the above-mentioned lawsuit pending against the Secretary and CMS) to Amitan Health Services, Inc.[9] On August 21, 1995, St. Johns moved the court to convert its Chapter 11 case to a Chapter 7 liquidation.[10] The court granted its motion.

---

[8] In its order, the court characterized St. Johns's request as one for a bankruptcy court determination of, "at least on a 'provisional' basis, the amount of existing defaults under the Provider Agreement . . . [and] a ruling . . . that the overpayment subject to recovery [by Aetna] is far less than the $11,657,059 estimated by [Aetna's] preliminary audit. If the amount . . . is less than the amount already withheld by Aetna," St. Johns would have the court issue an order prohibiting "[CMS] and Aetna [from] withholding postpetition reimbursement payments."

[9] By an order dated August 14, 1995, the court authorized the debtor to distribute approximately $738,633 (which was not included in the sale to Amitan Health Services, Inc.) to the holders of the Chapter 11 administrative claims. Other than the lawsuit mentioned above, this exhausted St. Johns's assets.

[10] As of that date, the pending claims of creditors included a claim by the United States in excess of $70 million.

II.

With the necessary background in place, we turn to the *qui tam* action before us and its somewhat complicated history. Relators Mario Cardoso and Valentine Sarasola worked for St. Johns during the early to mid 1990s. Cardoso was the company's auditor. Sarasola was the night shift supervisor.[11] On March 8, 1994, while St. Johns's Chapter 11 case was pending, Relators went to the Federal Bureau of Investigation and reported what they had observed while working for St. Johns – that St. Johns, as directed by its chief executive officer, Arnold Friedman, was defrauding the United States by seeking Medicare reimbursement from Aetna for home health care services that it had not provided. Some fifteen months later, on June 14, 1995, they brought a *qui tam* action in the United States District Court for the Southern District of Florida against St. Johns, Friedman,[12] and Aetna.[13] Their complaint alleged that St. Johns, at Friedman's direction, violated the provisions of

_____

[11] According to an affidavit Sarasola executed on August 25 and filed in the *qui tam* action on August 29, 1995, he was employed by St. Johns from February 21, 1993 to October 14, 1994. As far as we can tell, other than what is alleged in ¶ 35 of the Amended Complaint, the record does not indicate the period of Cardoso's employment at St. Johns.

[12] Friedman died on May 8, 1997. On August 25, 1997, the district court, on Relators' motion, ordered the executor of his estate, Dorothy Friedman, substituted for Friedman as a defendant. We refer to her herein interchangeably as Arnold Friedman or Friedman.

[13] Case No. 95-1278-CIV-MORENO.

12

31 U.S.C. § 3729 by presenting to Aetna for subsequent presentation to CMS "false or fraudulent claims for Medicare reimbursement payment or approval," which were supported by "false records or statements." Some of these claims were for services provided to "fictitious, deceased, or otherwise ineligible persons," for services that were not "medically justified," and for services "never provided."

The complaint alleged that Aetna, "in its capacity as the fiscal intermediary," "aided and abetted" this fraudulent conduct by approving St. Johns's claims "for payment" and by presenting them to CMS for "Medicare reimbursement." The 1995 complaint described Aetna's aiding and abetting activity as follows:

> 24. Aetna knew when it presented the claims or with the exercise of the slightest care before presenting the claims, Aetna should and would have known of the falsity of the claims it was presenting.
>
> 25. Aetna had actual knowledge of the falsity of the claims it submitted, acted in deliberate ignorance of the falsity of the claims, or acted in reckless disregard of the falsity of the information in that Aetna maintained a "Benefit Integrity Unit" and other administrative checks which resulted in actual disclosure to Aetna of the . . . false claims. Alternatively, the fraud on the part of St. Johns and Friedman was so pervasive, open and obvious that the most cursory of spot checks would and should have disclosed its existence had Aetna exercised even slight care in the fulfillment of its responsibilities as fiscal intermediary.

As relief, the complaint demanded judgment against the defendants as

13

follows: a civil penalty of not less that $5,000 and not more than $10,000 for each statutory violation; treble the amount of damages the Government sustained as a result of the defendants' fraud; and costs and attorneys' fees pursuant to 31 U.S.C. § 3730(d).

On August 22, 1995, the United States filed an unopposed motion to stay Relators' action until a criminal investigation and any resulting prosecutions involving the fraudulent activity alleged in Relators' complaint were concluded. The district court granted the motion the next day, with the proviso that the Government report the status of the criminal proceedings every ninety days.

On August 30, 1995, while the court's stay order was in effect, the court dismissed St. Johns as a party defendant in response to a notice of dismissal previously filed by the Relators. On October 2, 1995, the court granted Aetna's motion to dismiss Relators' complaint for failure to plead fraud with particularity, as required by Rule 9(b) of the Federal Rules of Civil Procedure. Relators filed an amended complaint on November 2, 1995. The amended complaint essentially replicated Relators' initial complaint, in particular the allegations that Aetna aided and abetted the St. Johns/Friedman fraud as described and quoted above. The amended complaint also alleged that Aetna's presentation of St. Johns's claims to CMS for reimbursement was "part of a scheme by St. Johns, Friedman and Aetna to

14

defraud the United States." Aetna moved to dismiss the amended complaint; the court, however, never ruled on its motion.

Meanwhile, the Government filed the required status reports every ninety days. The final such report, filed on March 12, 1999, indicated that on December 17, 1998 a Southern District of Florida grand jury returned an indictment charging twenty-six defendants with racketeering offenses, submission of false claims to Medicare, and money laundering. Sixteen of the defendants pled guilty to one or more of these offenses, and nine were to be tried in September 1999. Other individuals were still under investigation.

On June 14, 2000, the district court entered an order dismissing Relators' *qui tam* suit against Aetna, and directing the clerk to close the case. The order (1) recited that the United States had elected not to pursue Relators' allegations against Aetna, and (2) instructed Relators to file a new complaint by July 14 if they wished to proceed against Aetna. Relators filed a new complaint on July 14;[14] it was practically verbatim the amended complaint they had filed on November 2, 1995.

The new complaint replicated Relators' initial complaint (filed on June 14, 1995), in particular the "aiding and abetting" allegations that described Aetna's

---

[14] Because the court had dismissed Relators' *qui tam* suit one month earlier, it assigned a new case number for the suit Relators filed on July 14, Case No. 00-2521-CIV-MORENO.

conduct.[15]  Aetna moved the court to dismiss the complaint, contending that it is immune from liability under 42 U.S.C. § 1395h(i)(3) for payments its officers certify and disburse to Medicare providers and under our decision in United States ex rel. Body v. Blue Cross & Blue Shield of Alabama, Inc., 156 F.3d 1098 (11th Cir. 1998), which interpreted and applied section 1395(i)(3) in a similar context. Conceding, in their response to Aetna's motion, that "[t]he holding in Body applies squarely to the claim as presently stated against Aetna," Relators sought leave to amend their complaint.  The court granted them leave, and they filed an amended complaint.

The amended complaint repeats the allegations of the dismissed complaint which Body foreclosed – that is, the allegations that Aetna aided and abetted St. Johns's fraud, as described above – while introducing new allegations about Aetna's failure to audit in accord with its obligations to CMS.  After citing 42

---

[15] Like the November 2, 1995 amended complaint, the new complaint alleged that Aetna's conduct in approving St. Johns's claims and presenting them to CMS for Medicare reimbursement was "part of the scheme by St. Johns, Friedman and Aetna to defraud the United States."

16

U.S.C. § 1395h(a)[16] and 42 C.F.R. § 421.100(c)[17] for the proposition that Aetna, as

a fiscal intermediary, had the responsibility to audit St. Johns's records to ensure

that the services for which St. Johns was seeking reimbursement had actually been

provided and were covered by Medicare, the amended complaint alleged the

following:

> 43. Aetna willfully failed and refused to fulfill its . . . audit responsibilities as fiscal intermediary yet continued to misrepresent that it had done so, falsely claiming entitlement to . . . payments [under its contract with CMS] and accepting such payments without rendering the services for which the payments were being made.
>
> 44. By charging the United States for "phantom services" and accepting payment for services never rendered, Aetna . . . caused damage to the United States in the amount of such payments in addition to costing the United States money it would have recovered had the services been rendered.
>
> 45. By its conduct set forth herein, Aetna has denied [CMS] the meaningful opportunity to evaluate both

---

[16] Section 1395h(a) authorizes the Secretary to contract with a fiscal intermediary for the determination of the payments to be made to providers of Part A Medicare benefits, and provides that such contracts may include a provision requiring the fiscal intermediary "to make such audits of the records of providers as may be necessary to insure that proper payments are made under [Part A] . . . ."

[17] Section 421.100, "Intermediary functions," states that "[a]n agreement between [CMS] and a[ ] [fiscal] intermediary specifies the functions to be performed by the intermediary, which must include, but are not necessarily limited to . . . (c) *Provider audits*. The intermediary must audit the records of providers of services as necessary to assure proper payments."

17

Aetna's performance and the performance of those health care services providers whom Aetna was charged with monitoring and as warranted, to hire a more qualified fiscal intermediary who would have prevented the loss of substantial amounts of Medicare funds. Upon information and belief, had Aetna not actively concealed the deficiencies in its performance as fiscal intermediary from [CMS], another intermediary would have been hired.

. . .

47. By its conduct herein, Aetna has misrepresented its capacity and its intention to perform its duties under the [CMS] contract and has used false pretenses to obtain payments of government funds to which Aetna was not entitled.

48. Defendant Aetna has knowingly submitted false or fraudulent claims for payment, or caused false or fraudulent claims for payment for its services to be submitted, to officials of the United States government, in violation of 31 U.S.C. § 3729(a)(1).

49. Defendant Aetna has knowingly made or used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the officials of the United States government, in violation of 31 U.S.C. § 3729(a)(2).

50. Defendant Aetna has knowingly made or used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States government, in violation of 31 U.S.C. § 3729(a)(7).

51. Because of [Aetna's] conduct set forth above, the United States has suffered actual damages.

As relief, the amended complaint demanded "treble the amount of the United States' damages, plus civil penalties of not less than $5,000 and not more than $10,000 for each false claim," costs, attorneys' fees, Relators' expenses in prosecuting the case, and such other relief as may be appropriate.

Aetna moved the district court to dismiss the amended complaint on the grounds (1) that the <u>Body</u> decision foreclosed Relators' allegations relating to Aetna's involvement in the approval and payment of St. Johns's fraudulent claims for Medicare reimbursement, and (2) that the remaining allegations – those contained in paragraphs 43 through 51– constituted an attempt to "substitute an entirely new claim for the previously asserted claims that are concededly precluded by <u>Body</u>." The new claim, Aetna contended, did not relate back to the allegations of the initial and amended complaints Relators filed in 1995 and was therefore time-barred. Moreover, "[t]hese new allegations broadly assert that Aetna 'falsely claim[ed] entitlement to contract payments and accept[ed] such payments without rendering the services for which the payments were being made' . . . [but] fail to identify a single false claim submitted by Aetna or a single service billed for [something] not provided." For this reason, the amended complaint was subject to dismissal because Relators' new claim had not been pled with particularity, as required by Rule 9(b).

On June 26, 2001, the district court denied Aetna's motion. Aetna now appeals the court's ruling.

III.

A.

In denying Aetna's motion to dismiss, the district court made three rulings. First, Aetna is not entitled to immunity under 42 U.S.C. § 1395h(i)(3). Second, the Relators' claim that Aetna was paid for auditing services it either did not perform or performed inadequately is cognizable under the False Claims Act. Third, the Relators' allegations of fraud are sufficient to satisfy the "particularity" requirement of Rule 9(b).[18] Because Aetna is appealing an interlocutory order, which the district court did not certify for immediate appeal under 28 U.S.C. § 1292(b), our jurisdiction must lie under the collateral order doctrine. While 28 U.S.C. § 1291 gives this court jurisdiction only over "final decisions" of the district courts, the collateral order doctrine provides a narrow exception to this rule. The Supreme Court explained that a nonfinal order is appealable when it (1) "conclusively determine[s] the disputed question"; (2) "resolve[s] an important issue completely separate from the merits of the action"; and is (3) "effectively unreviewable on appeal from a final judgment." Coopers & Lybrand v. Livesay, 437 U.S. 463, 468,

---

[18] Fed. R. Civ. P. 9(b) states, in pertinent part: "In all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated with particularity."

20

98 S. Ct. 2454, 2458, 57 L. Ed. 2d 351 (1978).

We conclude that the collateral order doctrine provides us with jurisdiction to review the question whether Aetna has immunity with respect to any of the amended complaint's allegations.  The doctrine does not, however, give us jurisdiction to review the district court's second and third rulings.  Nonetheless, we believe that what we say about the immunity issue should inform the district court's task in dealing with what will remain of Relators' case at this juncture – that is, Relators' claim that Aetna breached its contract obligation to audit St. Johns's records "as necessary to assure proper payments."[19]  We intimate no view as to whether Relators' allegations of such breach suffice to state a claim under the False Claims Act and, if so, whether their allegations pass Rule 9(b) muster.  See, e.g., United States ex rel. Clausen v. Laboratory Corp. of America, 290 F.3d 1301 (11th Cir. 2002) (holding that claims arising under the False Claims Act must satisfy the dictates of Rule 9(b)'s particularity requirement).

B.

We need not tarry long in holding that, under our decision in United States ex rel. Body v. Blue Cross & Blue Shield of Alabama, Inc., 156 F.3d 1098 (11th Cir.

---

[19] Aetna's contract with the Secretary is neither attached to the amended complaint nor part of the record.  All we have is Relators' allegation that a formal contract, establishing Aetna as a fiscal intermediary, exists.

21

1998), Aetna enjoys absolute immunity under section 1395h(i)(3) for approving for payment the allegedly fraudulent claims that St. Johns presented for reimbursement. Relators recognized this when, in responding to Aetna's motion to dismiss, they acknowledged that Body foreclosed their claim as pled. In amending their complaint, however, they apparently decided to give it another go. Instead of abandoning the allegations that were concededly foreclosed by Body, they instead repeated them in toto and then tacked on paragraphs 43 through 45 and 47 through 51, quoted *supra*. Relators' prayer for relief then asks for "treble the amount of the United States' damages."

We assume, and we believe the district court did likewise, that Relators believe that their previous allegations of fraud are part and parcel of their new cause of action; otherwise, they would not have included them in their amended complaint. Given the prayer for damages quoted above, Relators evidently believe that they can, even in the face of Body, recover – from Aetna – the value of the funds St. Johns fraudulently received from the Medicare program (or, indeed, treble that amount). It is obvious, of course, that to allow such a recovery would render section 1395h(i)(3) immunity and the Body decision virtual nullities.

Relators' amended complaint, in effect, seeks recovery for the very conduct deemed immune in Body – payment of fraudulent claims by a fiscal intermediary –

22

simply by recasting the theory of recovery from "aiding and abetting" to some sort of contractual *res ipsa loquitur* – something akin to "Aetna was being paid by the government to conduct audits, fraudulent claims were paid, therefore Aetna must have not properly performed audits."  If Relators' view were the law, all that a *qui tam* relator would have to do to circumvent <u>Body</u> and state a cause of action under the False Claims Act against a fiscal intermediary would be to allege that the fiscal intermediary approved a provider's fraudulent claims for reimbursement and that the intermediary approved the claims because it failed properly to audit the provider's books.  Thus, "but for" the intermediary's failure to do its job, the false claims would not have been paid and the United States would have suffered no loss.

We held in <u>Body</u> that "fiscal intermediaries themselves will not be liable to the Government for *any* of the payments . . . certified by [its] certifying officers and disbursed by disbursing officers." 156 F.3d at 1111.  This absolute immunity was, we held, a recognition of the unique administrative function that fiscal intermediaries play in the operation of the Medicare system and Congress's unwillingness to impose liability for the vast amounts of federal money they disburse.  <u>Id.</u> at 1112.  Relators may not circumvent this immunity and recover for fraudulently disbursed payments by simply alleging a failure to audit.

In our Body decision, we noted that the statutory immunity is not so broad as to foreclose all claims against fiscal intermediaries. See 156 F.3d at 1112, n.26. Our decision today is not to the contrary. If Aetna, in fact, failed to fulfill its contractual obligation to properly audit St. Johns's records, then it might be liable to the United States, or a *qui tam* relator, under the False Claims Act for submitting a claim for payment for auditing services never rendered. The legal or factual feasibility of such a claim is not before us, however, in this interlocutory appeal.

In sum, Relators' allegations that St. Johns presented false claims to Aetna – pursuant to a scheme fashioned by St. Johns, Friedman, and Aetna to defraud the United States – and that Aetna knowingly, recklessly, or negligently approved such claims for payment are not actionable due to Aetna's statutory immunity, and we instruct the district court to strike them from the amended complaint.[20] Relators' *qui tam* claim, if they indeed have one under the False Claims Act, is limited to the false claims, if any, Aetna presented to the Secretary (within the statute of limitations time period) for auditing St. Johns's records.

SO ORDERED.

---

[20] We refer, in particular, to paragraphs 30 through 46, and 52 through 55. This is not to say, however, that the factual content of these allegations might not be relevant circumstantial evidence of Aetna's failure to audit St. Johns's records. We intimate no view regarding this evidentiary issue.