UNITED STATES of America ex rel. Richard FEINGOLD, Plaintiffs,

v.

PALMETTO GOVERNMENT BENE-FITS ADMINISTRATORS, Blue Cross and Blue Shield of South Carolina, and Unknown Durable Medical Equipment Suppliers, Defendants.

No. 99–938–CIV–GOLD/TURNOFF.

United States District Court, S.D. Florida.

Jan. 30, 2007.

**1188**

---

Atlee Wampler, Esq., Counsel for Relator Richard Feingold, Miami, FL, and Patricia Hanower, Esq., Department of Justice, Civil Division, Washington, DC, Sidney Berger, Esq. Co-counsel for Relator Richard Feingold, Chicago, IL, Mark Lavine, AUSA, U.S. Attorney's office, Miami, FL, for Plaintiffs.

H. Jacey Kaps, Esq. Counsel for Defendants Blue Cross and Blue Shield of South Carolina and Palmetto GBA, Inc., Miami, FL, and W. Jay DeVecchio, Esq. Co-Counsel for Defendants Blue Cross and Blue Shield of South Carolina and Palmetto GBA, Inc., Washington, DC, for Defendants.

1. The Defendants moving to dismiss are Blue Cross and Blue Shield of South Carolina, and its wholly owned subsidiary, Palmetto Government Benefits Administrator. Feingold originally named only Palmetto as a defendant, but later added Blue Cross. For convenience, these two Defendants will be referred to as "Palmetto."

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS; CLOSING·CASE . .

ALAN S. GOLD, District Judge.

THIS CAUSE came on before the Court on Motion to Dismiss the Amended Complaint [**DE 84**], filed April 17, 2006.[1] The Motion to Dismiss is fully briefed. I held oral argument on the Motion to Dismiss on December 8, 2006. After reviewing the parties' briefs and applicable case law, and after hearing the parties' positions at oral argument, I grant Defendant's Motion to Dismiss the Amended Complaint with prejudice.

### I. Facts

The relevant facts as alleged in the Amended Complaint, taken as true for purposes of considering a Motion to Dismiss, are as follows:

Richard Feingold, the Relator in this case, filed a Complaint against Palmetto pursuant to the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3732 (1982). Feingold alleges that Palmetto recklessly approved false claims in violation of the FCA.

In January of 1993, Palmetto entered into a contract with the Centers for Medicare and Medicaid Services ("CMS")[2] to serve as one of four Durable Medical Equipment Regional Carriers (the "DMERC" contract).[3] (Amended Compl. at ¶ 28). The DMERC contract provided that Palmetto would, beginning in approximately September, 1994, replace the Medicare carriers in 14 states, along with Puer-

2. CMS was formerly known as the Health Care Financing Administration (HCFA).

3. Palmetto also entered into two additional contracts with CMS, but those contracts are not at issue here.

to Rico and the Virgin Islands, and become the carrier with the responsibility of determining the propriety of Durable Medical Equipment Prosthetics Orthodontics Supplies ("DMEPOS") claims filed by suppliers under Medicare Part B for those areas. (*Id.* at ¶ 29). Under the contract, Palmetto was required perform administrative services including various anti-fraud checks to prevent the payment of fraudulent or false claims, and claims for medically unnecessary goods and services. (*Id.* at ¶ 31).

Feingold alleges that Palmetto failed to perform the required anti-fraud investigations, and that it failed to designate a certifying officer and/or a disbursing officer to administer claims payments. (*Id.* at ¶ 32). Feingold further alleges that Palmetto used false records or statements in various reports that were required for reimbursement under the Medicare program. (*Id.* at ¶ 33). Feingold also alleges that Palmetto knowingly utilized a computer program designed to override prepayment screens required by CMS, and that this program was deliberately used to elude detection of false claims. (*Id.* at ¶ 35).

Feingold claims that he is an original source of information relating to the fraudulent activities engaged in by Palmetto, as follows:

In the 1980's, Feingold had a home business supplying durable medical equipment, as well as a medical claims billing company. (*Id.* at ¶¶ 70, 71). Through his business contacts, Feingold became aware of a company called "Bulldog" that was providing diapers to nursing home patients, and billing the supplies to Medicare. (*Id.* at ¶ 71). Bulldog offered Feingold a job, which he declined; instead Feingold began his own durable medical equipment company, "Illiana," which began operations in January, 1994. (*Id.* at ¶¶ 72, 74). On March 11, 1994, Feingold received a Na-

tional Medicare Fraud Alert concerning improper billing and coding, and recognized that the alert pertained to the diapers that Illiana was providing, and receiving reimbursements from Medicare. (*Id.* at ¶ 75). Feingold's business partner contacted Administar, the region's carrier for DMEPOS claims, who informed him that Medicare would continue to pay their claims under the current code. (*Id.* at ¶ 76). Feingold then dissociated himself from the business. (*Id.* at ¶ 77).

Feingold then undertook an investigation regarding the use and supply of female urinary collection pouches (FUCPs). He interviewed nursing home directors and staff, and discovered that none of the health care professionals he spoke with had ever seen an FUCP used on a patient. Further investigation revealed that while various durable medical equipment suppliers were filing claims and being reimbursed for FUCPs, these items were not actually being provided. (*Id.* at ¶¶ 80–84). Instead, providers were supplying non-reimbursable, inexpensive diapers, and billing them under the code for the much more expensive FUCPs. (*Id.* at ¶ 84)

In May of 1994, Feingold filed a False Claims action against two companies, Bulldog and MLC Geriatric Health Services, which, through his investigation, Feingold knew to be fraudulently billing for FUCPs. As a result of this lawsuit, the government eventually received over $34 million from Bulldog. (*Id.* at ¶¶ 85–88). In July, 1994, Feingold filed a False Claims action against Illiana, his former company. (*Id.* at ¶ 89).

Between 1994 and 1995, five National Medicare Fraud Alerts were issued relating to fraudulent and improper billing for female diapers under the FUCP code. (*Id.* at ¶¶ 94–98). Then in 1998, Feingold read a newspaper article about two individuals who had been indicted for fraudu-

lently billing Medicare for diapers in 1994 and 1995. (*Id.* at ¶ 100). Feingold obtained copies of the indictments against these individuals and discovered that the claims were filed under the same code that was the subject of the False Claims actions he had filed in 1994. Feingold filed suit against Administar, the carrier for the region, alleging that Administar had violated the False Claims Act by approving payment for the improperly coded bills. (*Id.* at ¶ 103). Feingold's case against Administar was dismissed. The district court found, and the appellate court affirmed the decision, that Feingold was not an original source of the information supporting the False Claims action against Administar. (*Id.* at ¶ 104).[4]

While the Administar case was pending, Feingold undertook an investigation on his own to discover more about fraudulent FUCP claims. Feingold requested information from an unnamed "Medicare computer operator," and over the course of several years received certain printouts concerning billing for FUCPs. (*Id.* at ¶¶ 105, 106). Feingold claims that through his analysis of these computer printouts— which he claims are non-public information—he was able to determine that beginning in approximately 1993, fraudulent billing for FUCP claims rose dramatically. (*Id.* at ¶¶ 108–111). His analysis also revealed that Palmetto had the most inflated approval rates for FUCPs. (*Id.* at ¶ 112). Feingold claims that he discovered that Palmetto had approved over $40 million in false claims for FUCPs to date. (*Id.* at ¶ 113).

Feingold claims that based upon his personal knowledge and experience, he was able to request pertinent, non-public information, analyze that information, and determine that Palmetto was improperly approving claims for FUCPs. (*Id.* at ¶¶ 124, 128). Feingold then faxed a letter and a draft of the current False Claims Act Complaint to the United States Department of Justice, and then filed his Complaint under seal on March 31, 1999. (*Id.* at ¶ 139). Feingold alleges that following the Palmetto's notification of this lawsuit, Palmetto stopped approving virtually all FUCP claims. (*Id.* at ¶ 146).

Feingold asserts that after he alerted federal authorities of Palmetto's fraudulent activities regarding the FUCPs, the government began investigation into Palmetto's approval practices under other improper codes. (*Id.* at ¶ 148). Palmetto, alleges Feingold, not only approved improper claims, but created a claims processing scheme by which to bypass fraud screenings to be sure they would receive payment on fraudulent claims. (*Id.* at ¶ 151). Feingold claims that Palmetto continued to receive payment for performing administrative duties under its contract, but either did not perform those duties at all, or performed them in a recklessly inadequate fashion. (*Id.* at ¶ 152).

In Counts I and II of the Amended Complaint, Feingold alleges that Palmetto submitted false claims and made false statements in order to be paid for its administrative obligations under the contract, which Palmetto had failed to perform. In Counts III and IV, Feingold alleges that Palmetto knowingly presented false claims to Medicare for payment.

Feingold requests relief in the form of repayment to the United States for all claims improperly paid by Medicare, statutory triple damages, and civil penalties.

---

4. *See United States ex rel. Feingold v. Associated Insurance Companies, Inc.,* 2001 WL 1155250 (N.D.Ill.2001); *United States ex rel.* *Feingold v. AdminaStar Federal, Inc.,* 324 F.3d 492 (7th Cir.2003).

## II. Standard of Review

A complaint cannot be dismissed under Rule 12(b)(6) of the Federal Rules of Civil Procedure, unless "it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Marsh v. Butler County*, 268 F.3d 1014, 1022 (11th Cir. 2001); *Roe v. Aware Woman Center for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001), *cert. denied*, 542 U.S. 920, 124 S.Ct. 2875, 159 L.Ed.2d 777 (2004) (stating that complaint should not be dismissed unless it is "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations") (citations omitted). A complaint cannot be dismissed under rule 12(b)(6) even if "it may appear on the face of the pleadings that a recovery is very remote and unlikely." *Id.*

In determining whether to grant a motion to dismiss, the court must accept all the factual allegations in the complaint as true and evaluate all inferences derived from those facts in the light most favorable to the plaintiff. *See Hoffend v. Villa*, 261 F.3d 1148, 1150 (11th Cir.2001). Although the plaintiff is not held to a very high standard on a Rule 12(b)(6) motion, the plaintiff is still required to "allege some specific factual bases for those conclusions or face dismissal" of the claim. *Jackson v. Bellsouth Telecomm.*, 372 F.3d 1250, 1263 (11th Cir.2004).

Applying these well-established principles to the facts of this case, I grant the Motions to Dismiss.

## III. Analysis

Palmetto argues four points in support of its Motion to Dismiss: (1) that it, as a carrier, enjoys absolute immunity from suit under the Medicare Act; (2) that because Feingold's lawsuit is based on public information, the False Claims Act's jurisdictional bar prohibits this suit; (3) that the decision in the *Administar* case precludes this action;[5] and (4) that the Amended Complaint must be dismissed because Feingold has failed to plead fraud with specificity under Fed.R.Civ.P. 9(b).

I address only arguments two and four at this juncture. The remaining arguments are more properly addressed in a motion for summary judgment due to numerous issues of fact raised by the pleadings.

### A. Immunity Under the Medicare Act

■ Palmetto argues that the Counts III and IV must be dismissed on the basis of statutory immunity under the Medicare Act.[6] The Act provides for limited liability under certain conditions for carriers:

(e) Liability of certifying or disbursing officers or carriers.

(1) No individual designated pursuant to a contract under this section as a certifying officer shall, in the absence of gross negligence or intent to defraud the United States, be liable with respect to any payments certified by him under this section.

(2) No disbursing officer shall, in the absence of gross negligence or intent to defraud the United States, be liable

5. *See Feingold v. Associated Ins. Companies, Inc.*, 2001 WL 1155250 (N.D.Ill.2001), *aff'd U.S. ex rel. Feingold v. AdminaStar Federal, Inc.*, 324 F.3d 492 (7th Cir.2003).

6. Palmetto also urges the Court to dismiss Counts I and II based on statutory immunity, relying on *United States ex rel. Sarasola v.*

*Aetna Life Ins. Co.*, 319 F.3d 1292 (11th Cir. 2003). While *Sarasola* does create an uphill struggle for Feingold's claims of failure to perform services, it does not foreclose those claims entirely. I therefore decline to dismiss Counts I and II on the basis of statutory immunity.

with respect to any payment by him under this section if it was based upon a voucher signed by a certifying officer designated as provided in paragraph (1) of this subsection.

(3) No such carrier shall be liable to the United States for any payments referred to in paragraph (1) or (2).

42 USCS § 1395u(e).[7] Palmetto argues that the clear language of the statute, along with Eleventh Circuit precedent, mandate that it be found immune from this lawsuit, citing *Body v. Blue Cross and Blue Shield of Alabama*, 156 F.3d 1098 (11th Cir.1998) and *Sarasola v. Aetna Life Ins. Co.*, 319 F.3d 1292 (11th Cir.2003). I agree with Palmetto's position.

In both *Body* and *Sarasola*, the Eleventh Circuit made clear that fiscal intermediaries such as Palmetto are immune from liability for any payments certified and disbursed by its officers:

> subsection 1395h(i)(3) broadly states that the fiscal intermediaries themselves will not be liable to the Government for *any* of the payments referred to in paragraphs (1) and (2)—that is, payments certified by certifying officers and disbursed by disbursing officers.

*Body*, 156 F.3d at 1111 (emphasis in original). This recognition of absolute immunity under the Act was reiterated in *Sarasola*:

> We held in *Body* that "fiscal intermediaries themselves will not be liable to the Government for *any* of the payments . . . certified by [its] certifying officers

and disbursed by disbursing officers." 156 F.3d at 1111. This absolute immunity was, we held, a recognition of the unique administrative function that fiscal intermediaries play in the operation of the Medicare system and Congress's unwillingness to impose liability for the vast amounts of federal money they disburse.

*Sarasola*, 319 F.3d at 1302.

Feingold attempts to circumvent the Eleventh Circuit's holding in two ways: first, he alleges that Palmetto did not designate either certifying officers or disbursing officers; and second, he argues that the holding in *Body* and *Sarasola* is limited to Medicare Part A carriers, and does not extend to Part B carriers.

### 1. Failure to Designate Officers

Feingold alleges in his Amended Complaint that Palmetto failed to designate either certifying or disbursing officers to administer payments. Specifically, he alleges that

> Indeed, on information and belief, the Government Contractor Defendants even failed to perform the rudimentary function of designating a certifying officer and/or a disbursing officer as set out in the Contract and statutory scheme to administer claims to be paid to suppliers under Part B of the Medicare Program.

(Compl.¶ 32). Feingold claims that this failure to designate certifying and/or disbursing officers excludes Palmetto from

---

7. The Act has since been amended to replace the term "carrier," used to describe Medicare Part B providers, and "intermediary," which described Part A providers, with a broader and more generic term "Medical administrative contractor." See the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 911(d), Pub.L. No. 108–173, 117 Stat. 2066 (codified at 42 U.S.C. 1395kk–1 (2003)). The language describing the limits of immunity have also changed. However,

because there is no indication that the amended statute(s) were to have retroactive applicability, the version of the statute applicable here is that which was in effect at the time the alleged actions occurred. *See Langdraf v. USI Film Prods.*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)(presumption against retroactivity may be overcome only be "clear congressional intent"). The applicable language is recited above.

the Act's immunity protections. Palmetto counters that Feingold's bald and unsupported allegation cannot stand under Eleventh Circuit standards. Palmetto points out that Feingold's allegation as to the failure to designate officers is merely "on information and belief," and is not supported by a single evidentiary or factual allegation with any particularity.[8]

The Eleventh Circuit has made clear that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt. v. Jaharis,* 297 F.3d 1182, 1188 (11th Cir.2002), citing *South Florida Water Management Dist. v. Montalvo,* 84 F.3d 402, 406 (11th Cir.1996); *Fernandez–Montes v. Allied Pilots Ass'n,* 987 F.2d 278, 284 (5th Cir.1993).

In this case, Feingold makes the allegation that Palmetto did not designate a certifying and/or disbursing officer. However, Feingold has no factual basis whatsoever for that allegation; as noted, it is made merely "on information and belief." As Feingold has no insider knowledge of the manner in which Palmetto conducted business, he has no basis for this bald allegation. It appears that the Feingold, knowing the Eleventh Circuit's precedent in *Body* and *Sarasola* as to immunity under the False Claims Act, is simply trying to avoid dismissal by the inclusion of this conclusory statement. This unsupported allegation will not exclude Palmetto from the False Claims Act's immunity defense.

### 2. Immunity for Part A vs. Part B Carriers

Palmetto attempts to distinguish *Body* and *Sarasola* from the case at hand on the grounds that both *Body* and *Sarasola* involved Part A intermediaries, whereas this case involves a Part B carrier. This argument fails, for the distinction is meaningless.

The language in the immunity provisions in the Medicare Act for Part A intermediaries (42 U.S.C § 1395h(i)), and for Part B carriers (42 U.S.C. § 1395u(e)) is virtually identical. The *only* difference in the two sections is that the Part A immunity provisions provides that "[n]o such **agency or organization** shall be liable," whereas the Part B immunity provision provides that "no such **carrier** shall be liable." Moreover, courts have consistently treated Part A and Part B carriers in the same fashion. *See, e.g., Body,* 156 F.3d at 1106 n. 17 (a carrier is "the Part B equivalent of a fiscal intermediary"); *U.S. ex rel. Rahman v. Oncology Associates, P.C.,* 198 F.3d 502, 512 n. 2 (4th Cir.1999)("Fiscal intermediaries and carriers perform comparable roles . . . Courts have treated them in the same way").

Given the unambiguous, identical language of the immunity provisions, and the comparable treatment of Part A and Part B carriers by the courts, there is no reason to believe that the precedents established in *Body* and *Sarasola* are·not applicable in this case. Palmetto, therefore, is protected by the False Claims Act's immunity provisions, and shall suffer no liability for any improper payments which might have been made. Count III and IV—alleging improper payment of claims—must therefore be dismissed.

### B. Failure to Plead Fraud with Specificity

■ Palmetto moves to dismiss all counts for failure to plead fraud with specificity. Generally, federal civil complaints need only state "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a), and each averment should be "simple, concise, and direct," with no technical form of pleading required. Fed.R.Civ.P. 8(e).

---

**8.** See discussion on the need to plead fraud with particularity at pages 11–16, *supra.*

However, "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1308 (11th Cir. 2002).

█ FCA claims must be stated with particularity pursuant to Rule 9(b). *See Clausen*, 290 F.3d at 1308("Rule 9(b) [applies] to actions under the False Claims Act"). Particularity means that "a plaintiff must plead 'facts as to time, place, and substance of the defendant's alleged fraud,' specifically 'the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350 (11th Cir.2006); *Clausen*, 290 F.3d at 1310 quoting *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 567–68 (11th Cir.1994). In *Atkins*, the Eleventh Circuit explained that

> Rule 9(b)'s directive that "the circumstances constituting fraud or mistake shall be stated with particularity" does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.
>
> We cannot make assumptions about a False Claims Act defendant's submission of actual claims to the Government without stripping all meaning from Rule 9(b)'s requirement of specificity or ignoring that the "true essence of the fraud" of a False Claims Act action involves an actual claim for payment and not just a preparatory scheme.

*Atkins*, 470 F.3d at 1357, citing *Clausen*, 290 F.3d at 1311 (quoting Rule 9(b)). The

court emphasized that "if Rule 9(b) is to be adhered to, some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." *Id.*

In both *Clausen* and *Atkins*, the district courts dismissed the relators' claims on the grounds that the relators had failed to allege any specific facts to demonstrate that the defendants actually submitted false claims to the government. The relators in those cases described in great detail the fraudulent scheme itself, but were unable to provide a single concrete allegation describing the submission of a false claim. The court distinguished the facts of both *Clausen* and *Atkins* from *Hill v. Morehouse Med. Assoc., Inc.*, 82 Fed. Appx. 213, 2003 WL 22019936 (11th Cir. 2003), in which a relator's claims withstood dismissal. In *Hill*, the relator had

> firsthand information about the [defendant's] internal billing practices and the manner in which the fraudulent billing schemes were implemented. Moreover, she alleged that she observed [the defendant's] billers, coders, and physicians alter various CPT and diagnosis codes over the course of [her] seven months and thus submit false claims for ... reimbursement to the government.... Most important, ... unlike the plaintiff in [Clausen], [the Hill plaintiff] was privy to [the defendant's] files, computer systems, and internal billing practices ... because she worked in [the defendant's] billing and coding department for seven months.

The Eleventh Circuit described the scenario in *Atkins* as follows:

> In the case at hand, the complaint fails rule 9(b) for want of sufficient indicia of reliability to support the assertion that the defendants submitted false claims. As the plaintiff did in *Clausen*, Atkins has described in detail what he believes

is an elaborate scheme for defrauding the government by submitting false claims. He cites particular patients, dates and corresponding medical records for services that he contends were not eligible for government reimbursement. Just like the *Clausen* plaintiff, though, Atkins fails to provide the next link in the FCA liability chain: showing that the defendants actually submitted reimbursement claims for the services he describes. Instead, he portrays the scheme and then summarily concludes that the defendants submitted false claims to the government for reimbursement.

In his complaint, Atkins does not profess to have firsthand knowledge of the defendants' submission of false claims. He is a psychiatrist responsible for the provision of medical care, not a billing and coding administrator responsible for filing and submitting the defendants' claims for reimbursement. He rotated through a single facility where he heard rumors from staff and observed records of what he believed to be the shoddy medical and business practices of two other psychiatrists. He then brought suit against those two psychiatrists, their company, and the SNF's where, he alleges, those two psychiatrists had provided psychiatric care over a three-year period. The Hill relator, by contrast, personally observed the behavior of which she complained during the seven months she spent in her employer's billing and coding department, and then brought her action against her employer. Atkins's complaint not only fails to contain an indicia of reliability approaching the level of reliability found in the Hill allegations, it sweeps with a much broader brush by naming as defendants SNF's into which Atkins never stepped foot. Faced with these pleading deficiencies, we would be hard pressed to say that Atkins's complaint satisfies the particularity requirement of Rule 9(b).

The facts at hand are remarkably similar to those found in *Clausen* and *Atkins*.[9] Feingold here has no firsthand knowledge of any fraudulent conduct on the part of Palmetto. Feingold never worked for or with Palmetto, nor did he ever submit any false claims to Palmetto which were subsequently approved by Palmetto. Feingold argues that he embarked upon an investigation by which he uncovered Palmetto's fraudulent scheme, but he is able to demonstrate only generalities.

In his Complaint, consisting of 214 paragraphs over 116 pages, Feingold includes a wealth of information concerning the history of the FUCP scheme. He similarly provides an abundance of allegations concerning the ways in which claims are processed and submitted from health care providers to carriers, and from carriers to the government. He fails, however, to point so specific examples of fraudulent claims approved or submitted by Palmetto. In his Complaint, Feingold engages in a lengthy discussion of various fraudulent

---

**9.** Also similar to *Clausen*, Feingold is a multiple filer. The Eleventh Circuit noted that "We find it ironic that Clausen was himself a relator in *LaCorte*, in which the Third Circuit barred him from bringing a lawsuit against SmithKline Beecham regarding medical testing after a similar, but not identical, lawsuit had already been brought. 149 F.3d at 237. In rejecting Clausen's argument that the decision in *LaCorte* would lead to relators pleading a 'very broad cause of action so as to preempt claims by later plaintiffs,' the Third Circuit observed that Rule 9(b) 'provides sufficient deterrence against overly broad allegations.' " *Clausen*, 290 F.3d 1301. In the case at hand, as in *Clausen*, Rule 9(b) works to prohibit a lawsuit based upon the broad and generalized allegations brought by a multiple relator.

statements allegedly made by Palmetto in reports submitted in 1995, and he references "Exhibit Q" of the Complaint (Compl.¶ 178). Exhibit Q, however, is the "Carriers Manual," which is available from a government manual website. Exhibit Q is not an actual report submitted by Palmetto to the government with false statements. Rather, it is a guideline manual which explains what specific information is required on various reports that carriers submit to the government. Feingold then extrapolates that Palmetto *must* have submitted fraudulent reports, because FUCP fraud was rampant at that time. He fails, however, to identify or produce a single fraudulent claim form or report prepared by Palmetto.

Because of his earlier experience at Illiana, where he personally observed the submission and payment of fraudulent FUCP claims, Feingold has reason to believe that the fraudulent practices are industry wide. However, a reason to believe that fraud is occurring is far from sufficient to withstand dismissal under the rigorous standards of Rule 9(b), particularly in light of the recent Eleventh Circuit cases dismissing comparable *qui tarn* actions. As the court explained, "The particularity requirement of Rule 9 is a nullity if Plaintiff gets a ticket to the discovery process without identifying a single claim." *Atkins,* 470 F.3d at 1359. Citing *Clausen,* the court reasoned that

> If given such a ticket, the next stage of [the] litigation is clear. The Plaintiff will request production of every ... claim submitted by the Defendant [during the time period corresponding to Plaintiff's claims]. At that point, the Defendant may decide to settle the case to avoid the enormous cost of such discovery and the possible disruption of its ongoing business. On the other hand, the Defendant may choose to resist the discovery. In that case, the Court will be presented with the dilemma of allow-

ing an unlimited fishing expedition or no discovery at all because of the difficulty in fashioning logical and principled limits on what has to be produced. The particularity requirement of Rule 9(b), if enforced, will not only protect defendants against strike suits, but will result in claims with discernable boundaries and manageable discovery limits.

*United States ex rel. Clausen v. Lab. Corp. of Am.,* 198 F.R.D. 560, 564 (N.D.Ga.2000), aff'd, 290 F.3d 1301 (11th Cir.2002).

Requiring relators to plead FCA claims with particularity is especially important in light of the quasi-criminal nature of FCA violations (i.e., a violator is liable for treble damages). Rule 9(b) ensures that the relator's strong financial incentive to bring an FCA claim—the possibility of recovering between fifteen and thirty percent of a treble damages award—does not precipitate the filing of frivolous suits.

*Atkins,* 470 F.3d at 1359.

As the court noted in Feingold's *Administar* case, Feingold made a considerable sum of money as a result of his initial *qui tarn* actions. *See United States ex rel. Feingold v. Associated Ins. Co.,* 2001 WL 1155250, at *1 (N.D.Ill.2001). Clearly, he has had a financial incentive to repeat that success. However, Feingold was in a position to bring the initial lawsuit against Illiana and Bulldog as an appropriate relator: he had specific factual evidence of the fraud, and he was an original source of the information. That is the sort of claim that the laws surrounding *qui tarn* suits are designed to permit, and to reward. However, when a relator seeks to repeat earlier financial success by filing an action based simply on a supposition that other entities are involved in similar fraudulent activities, that is the sort of "parasitic" lawsuit

which the False Claims Act is designed to prohibit.[10]

Under the well-established standards of the Eleventh Circuit, Feingold has failed to plead fraud with particularity sufficient to withstand dismissal. Accordingly, Feingold's Complaint must be dismissed.

## C. Leave to Amend

Feingold has not requested that, should I dismiss his Complaint, he be granted leave to amend. However, I anticipate that he will make such a request, and therefore address the issue now.

■ Federal Rule of Civil Procedure 15(a) states that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *Pioneer Metals, Inc. v. Univar USA, Inc.*, 168 Fed.Appx. 335, 336–337, 2006 WL 353465 (11th Cir.2006). "Unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Id.*, citing *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir.1988) (quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir.1981)). The Supreme Court has emphasized that leave to amend *must* be granted absent a specific, significant reason for denial. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The permissible reasons that can justify denial of leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ... [, and] futility of amendment...." *Pioneer Metals*, 168 Fed.Appx. at 336–337. The justifying reason must be either explicitly

declared or apparent. *Id.* The Eleventh Circuit has indicated that it views with great distaste district court denials of amendments without stated reasons. *Id.*, citing *Rhodes v. Amarillo Hosp. Dist.*, 654 F.2d 1148, 1153–1154 (5th Cir.1981).

■ In this case, I will dismiss Feingold's Complaint with prejudice, denying leave to amend on the basis of futility. Feingold has, at this point, filed at least five *qui tam* actions. As discussed above, his two initial lawsuits were based upon information that he garnered by having personal knowledge of the ongoing fraud. Since then, however, Feingold has initiated at least three *qui tam* suits alleging facts of which he has had no personal knowledge. He has clearly educated himself on how to plead to avoid certain obvious deficiencies; his latest action attempts to avoid every basis for dismissal in *Administar*, as well as deficiencies found by other courts in *qui tam* actions brought by other relators. Nonetheless, Feingold has failed to state a cause of action against Palmetto in this case. Given the fact that Feingold is a repeat filer who is not an insider of Palmetto, and because he has no personal knowledge of Palmetto's claims procedures, there are no circumstances under which Feingold could amend his Complaint to cure the deficiencies therein.

## IV. Conclusion

Because I find dismissal appropriate on the bases of the False Claims Act's immunity provisions as well as the Complaint's incurable failure to plead fraud with specificity, I need not address Palmetto's remaining arguments for dismissal: issue

---

10. *See, e.g., Cooper v. Blue Cross & Blue Shield*, 19 F.3d 562 (11th Cir.1994)(discussing the False Claims Act's *qui tam* provisions to prevent parasitic lawsuits); *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966 (6th Cir. 2005)(same); *United States ex rel. Atkinson v.* *PA. Shipbuilding Co.*, 473 F.3d 506, 2007 U.S.App. LEXIS 708 (3d Cir.2007)(same); *United States ex rel. Karvelas v. Melrose–Wakefield Hosp.*, 360 F.3d 220 (1st Cir. 2004)(same).

preclusion based on the *Administar* holding, and the jurisdictional public disclosure bar.[11]

Accordingly, it is hereby **ORDERED and ADJUDGED** that:

1. Defendants' Motion to Dismiss the Amended Complaint **[DE 84]** is **GRANTED, with prejudice.**

2. Counts III and IV are dismissed based upon statutory immunity under the Medicare Act.

3. Counts I through IV are dismissed based upon Plaintiff's failure to plead fraud with specificity.

4. This case is CLOSED.

5. All pending motions are DENIED as moot.

**DONE AND ORDERED.**

---

**11.** I also point out that, in order to rule on Palmetto's public disclosure argument, it would have been necessary to convert this motion to dismiss into a motion for summary judgment, which I decline to do at this juncture.